THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIGUEL LOPEZ, Defendant-Appellant.

First District (5th Division)   No. 85—378

Opinion filed February 6, 1987.

James J. Doherty, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, James E. Fitzgerald, and Steven J. Zick, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a jury trial, defendant Miguel Lopez was found guilty of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)) and sentenced to 30 years' imprisonment in the Illinois Department of Corrections and 3 years of mandatory supervised release. On appeal, defendant contends that: (1) he was denied a fair trial as a result of multiple instances of improper prejudicial hearsay testimony and innuendo that a

large crowd of people identified him as "the shooter" of the victim; (2) he was denied a fair trial as a result of multiple instances of prejudicially improper closing argument, compounding earlier acts of prosecutorial misconduct; (3) the trial court invaded the province of the jury by refusing his tendered instruction on voluntary manslaughter; and (4) the trial court abused its discretion in sentencing him to 30 years' imprisonment. For the reasons set forth below, we reverse and remand.

The pertinent facts are as follows. On September 11, 1982, between 11:30 and 11:45 p.m., an argument occurred between defendant and the victim Jose Vega, also known as "Pepe," the manager of the El Pavo Rael tavern located at 4928 South Ashland in Chicago. The initial argument began when Essie Derringer, the victim's girlfriend and an employee of the tavern on the night of the incident, demanded that defendant and his companion pay for their drinks after they allegedly refused to do so. The victim became involved in the argument after "a man" started to hit Derringer on the back of the head. Victor Santiago, the tavern owner, subsequently intervened when he saw the victim pull a pistol from his pocket. He jumped between the victim and defendant, and persuaded defendant, whom he knew as "Raul," and his companion to leave the tavern, telling them to "forget about the whole thing." The next morning, at approximately 2:45 a.m., the victim was shot to death in the tavern, having suffered five gunshot wounds to his body. Defendant was later arrested as the assailant.

At trial, Essie Derringer identified defendant as the man who argued with the victim, stating that he was wearing a yellow "muscle" T-shirt and blue slacks at the time. She also stated that during the argument she saw the victim take a gun from his belt, but that he did not point it at anyone and held it in his hand hanging at his side. Derringer further testified that several hours after the initial confrontation she was standing at the end of the bar talking with the victim, who was seated on a bar stool, when defendant appeared from the rear of the tavern holding a gun in front of him with both hands, shouted the name "Pepe," and began firing one shot after another at the victim. Derringer stated the victim was unarmed at the time, that she saw defendant's face clearly because he was facing her as he fired the gun from an approximate distance of 10 feet, that defendant was wearing the same yellow T-shirt and blue slacks he had been wearing at the time of the earlier argument in the tavern, and that defendant ran out of the front door of the tavern after the shooting. Paul Escamilla, a tavern customer, similarly testified that he saw the back of

a man wearing a yellow T-shirt and light blue jeans leaving the front door of the tavern at that time.

Daniel Rodriguez, who was then 14 years old, testified that at approximately 2:45 a.m. he saw defendant enter the tavern carrying a gun, heard gunshots one minute later, and saw defendant leave the tavern still holding the gun in his hand. He further stated that he noticed defendant was staggering as if drunk, that he passed through a gangway towards the alley behind the tavern, and that he got into a brown Chevrolet Monte Carlo with a two-tone roof. Rodriguez also testified that he did not remember whether defendant got in the passenger's or driver's side of the car, that he could not see how many people were in the car, and that the car's engine was running but its lights were off and he was unable to see the license plate. After the car sped away, he returned to the front of the tavern and gave a description of the automobile to a police officer, who immediately broadcasted it over his police radio.

Chicago police officer Frank Cusimano testified that he and his partner were refueling their police squadrol when they heard the broadcast of the vehicle wanted in connection with the tavern shooting. Shortly thereafter Cusimano saw an automobile matching that description. Cusimano and his partner pursued and stopped the car. Inside the car, Cusimano found defendant, whom he testified was the driver, and two passengers. He stated that defendant was wearing a sleeveless, yellow T-shirt and blue pants. Because the officers did not have a full description of the assailant involved in the shooting, Cusimano wrote down the car's license plate number and allowed defendant and his companions to proceed on their way. He and his partner then drove to the El Pavo Rael tavern where they obtained a further description of the offender, apparently from a later account given by Rodriguez to the police at the scene. In observing that the description matched defendant, Cusimano ran a registration check on the car's license plate number and then drove to the location where Jose Esquibel, the registered owner, lived. Finding the car parked and empty, the officers waited until defendant and his companions approached the vehicle, stopped defendant, and placed him under arrest. Defendant was then handcuffed, placed in the squadrol, and transported to the tavern site.

Chicago police officer Thomas Glynn was at the tavern when the squadrol arrived. Glynn, who had interviewed several witnesses prior to that time, was told that the possible offender was in the squadrol. He then asked an unidentified woman to look inside the squadrol, and brought her outside. After looking inside, the woman screamed,

"That's him, that's him there." Upon hearing the woman scream, a number of people ran out of the tavern and also started screaming, "That's him, that's him." Daniel Rodriguez was also asked to look inside the squadrol and, after doing so, told the police that defendant was the man he had seen entering and leaving the tavern with a gun. Thereafter, defendant was transported to the Area Three police station. Cusimano subsequently indicated on his arrest report that defendant had been drinking but was not intoxicated.

At approximately noon that same day, Essie Derringer viewed a lineup and identified defendant as the man who was involved in the argument in the tavern the day before and the man who had shot the victim; defendant was dressed in the same yellow T-shirt and blue pants he had allegedly worn during the argument and at the time of his arrest. At trial, Derringer appeared to equivocate concerning her identification of defendant at the lineup, stating that she was "pretty sure," but not positive, that defendant was the offender. Under further questioning, however, she adamantly asserted she had told the police that defendant was the man responsible for the crime and that she did not know where the police "got the term, 'pretty sure.' " She also stated that prior to trial she left Chicago because she was "afraid to come and appear on the witness stand," but that she subsequently returned when arrangements were made by the State to have her flown back to Chicago.

During the State's case in chief, it also sought to call as a witness James Vrchoda, one of its investigators, for the purpose of explaining the State's unsuccessful efforts to secure the testimony of three witnesses. Defendant objected, and the court, after conducting a *"voir dire* of the witness" outside the presence of the jury, sustained defendant's objection, holding that the possible prejudicial value of the witness' testimony would outweigh any probative value that it would have to the jury.

Efrain Munoz, who was called as the sole witness for defendant, testified that he was at the tavern on the night of the argument, that he saw the victim place a gun against the chest of a man he was arguing with, but that he did not pay attention to the argument, was playing pool at the time of the shooting, and just saw the gunman running out of the tavern without stumbling. Munoz never looked inside the squadrol at the tavern site, could not remember the gunman's clothing, and told the police he could not identify anyone. Similarly, Victor Santiago, previously called as a witness on behalf of the State, stated he did not remember how defendant was dressed at the time of the argument and did not see the shooting, although he had

been in the tavern at that time.

Defendant did not testify on his own behalf at trial. However, in opening argument, defense counsel "suggested a modified alibi defense" to the effect that defendant was in another tavern at the time of the shooting and was later being given a ride home by the occupants of the Monte Carlo when it was stopped by the police.

After closing arguments, defendant moved for a mistrial, based on the State's alleged improper closing argument. The motion was denied, as was defendant's motion for a new trial in which defendant alleged as grounds for reversal the denial of his voluntary-manslaughter instruction, the shifting of the burden of proof to him, and other alleged prosecutorial misconduct.

I

Defendant first argues that he was denied a fair trial as a result of multiple instances ·of improper prejudicial hearsay testimony and innuendo that a large crowd of people identified him as the "shooter" when he was exhibited to them while in the police squadrol. The State contends that this testimony was admissible under the spontaneous-declaration exception to the hearsay rule. Alternatively, it also argues that if the testimony complained of was hearsay, it was properly admitted because defendant failed to make a timely objection and it was therefore waived or any error in its initial admission was cured when the court sustained defendant's later objection to it or that its admission constituted harmless error in light of the overwhelming evidence of defendant's guilt, especially the identification of defendant by several other witnesses.

■ Hearsay is defined as testimony of an out-of-court statement offered to establish the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court asserter. (*People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223.) "The basis for excluding evidence under the hearsay rule lies in the fact that an opportunity to ascertain the veracity of the testimony is absent." (81 Ill. 2d 571, 577, 411 N.E.2d 223.) Thus, an opportunity for cross-examination of the party whose assertions are offered to prove the truth of the fact asserted is an essential requirement of such a testimonial offering and, accordingly, testimony by a third party as to statements made by another nontestifying party identifying an accused as the perpetrator of a crime constitutes hearsay testimony and is inadmissible. 81 Ill. 2d 571, 577-79, 411 N.E.2d 223.

In the instant case, the testimony complained of was elicited from three police officers. Initially, without objection by defendant, the fol-

lowing colloquy occurred between the State and Officer Glynn:

"Q. [Prosecutor] [W]hat happened when you brought this female out of the tavern?

A. [Officer Glynn] The officer from the wagon got out and he had opened up the back door of the wagon.

Q. Now immediately upon opening that wagon, what if anything happened?

A. She looked in and she screamed, that's him, that's him there.

Q. After this female screamed, what happened next?

A. A lot of people came running out of the tavern and they all started screaming at, that's him, that's him."

Similar testimony, which was objected to by defendant and sustained by the court, was elicited from Officer Cusimano and Detective Bedran. Officer Cusimano testified as follows:

"When we pulled up in front of the—we pulled in front of the tavern. We double parked the vehicle [squadrol] out in front and I went to the rear of the vehicle. There was [*sic*] quite a few people out in front of the tavern.

Q. [Prosecutor] What did you do when you went to the rear of the squadrol?

A. I opened the rear door.

Q. Were any persons around at that time?

A. At that time it was approximately ten, ten, eleven, twelve people. I didn't get an exact count, but approximately a dozen people.

Q. What happened when you opened the rear door?

A. When I opened the rear door several people walked up to the door itself. One woman in particular looked in and started to scream that's him, that's him.

[Defense Counsel]: Objection.

THE COURT: Objection is sustained.

Q. [Prosecutor] Did other people near him say anything?

A. There were other people there. Yes, they also said—

[Defense Counsel]: Objection.

THE COURT: Objection is sustained as to what they said.

Q. [Prosecutor] Did they say the same thing as the first woman?

[Defense Counsel]: Objection.

THE COURT: Objection sustained."

Detective Bedran also testified as follows:

"Q. [Prosecutor] After Officer Glenn exited the tavern with this female, what, if anything did you do?

A. I followed him.

Q. Okay, and, what, if anything, happened, what did you observe when you went outside?

A. Squadrol officer opened up the back of the wagon,—the squadrol and witness that—

[Defense Counsel]: Objection, your Honor. May we approach the bench?

THE COURT: You may.

(The following proceedings were had out of the hearing of the jury:)

[Prosecutor]: Your Honor, there will be no hearsay.

THE COURT: Proceed.

(The following proceedings were had within the hearing of the jury:)

Q. [Prosecutor] Without saying what that woman said, what, if anything happened when the squadrol doors were opened?

A. She looked in and she starts screaming.

Q. Immediately after this woman screamed, what happened?

A. I told the—several other people right around us also looked in and they started yelling."

■ After a review of the above testimony, we agree with defendant that it was clearly hearsay in light of the fact that all three officers testified to statements made by the nontestifying woman and crowd of people whom defendant was precluded from cross-examining. Moreover, even the State acknowledged the hearsay nature of the squadrol identification when it told the court in a sidebar that in questioning Detective Bedran there would be no hearsay, and it then specifically phrased a question to Bedran instructing him to answer "without saying what the woman said" with respect to what happened when the squadrol doors were opened. We further note that although Bedran responded that the woman screamed and that several other people also looked into the squadrol and started yelling, the characterization of the parties screaming or yelling did not lessen the prejudicial effect of this testimony since the jury had already been told twice by Glynn and Cusimano that the woman screamed "that's him, that's him there," and twice, specifically and indirectly, that a crowd of people identified defendant in a similar manner by their "screaming."

■ We also do not find that the complained-of testimony was ad-

missible, as the State contends, under the spontaneous-declaration exception to the hearsay rule. For testimony to qualify as a spontaneous declaration, three factors must be present: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. *People v. Fields* (1979), 71 Ill. App. 3d 888, 390 N.E.2d 369.

Based on the circumstances here, the first two factors have not been met. We do not believe that the unnamed woman's or crowd's identification of defendant in the squadrol can be characterized as spontaneous and unreflecting statements made in the absence of time to fabricate. The squadrol identification occurred approximately 1½ hours after the shooting. Paul Escamilla, one of the State's witnesses who did not see the offender's face but had observed that he was wearing a yellow T-shirt and blue jeans, testified that he was "talking to some guys" on the street outside the tavern when the squadrol arrived. Prior to that time, we believe it unlikely that Escamilla—or any of the other dozen people who appeared hysterical or unruly and who ran out of the tavern when the squadrol arrived—did not discuss the occurrence while in the tavern. Any such discussion, therefore, would preclude their squadrol identification of defendant from being spontaneous statements 1½ hours later.

We briefly note that the State's reliance on *People v. Watson* (1982), 107 Ill. App. 3d 691, 438 N.E.2d 453, concerning this issue is misplaced. In *Watson*, a three-year-old child fell asleep for one hour after being sexually abused by the defendant. Upon being awakened and taken to a hospital, she made a statement to emergency-room nurses that her injury was not a result of falling on a rocking chair as the defendant claimed. The *Watson* court held that the nurses' testimony as to the child's statement to them was admissible under the spontaneous-declaration exception to the hearsay rule based on the fact that the child had been asleep and had had no time to fabricate. Here, the tavern customers had time to reflect upon what each of them believed occurred.

Accordingly, given the suggestive nature of presenting defendant to a crowd of hysterical people (see *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152), alone and handcuffed in the squadrol, and the time within which to reflect by them upon what had occurred prior thereto, any identification of defendant made by these people cannot be characterized as spontaneous statements. We therefore hold that the squadrol identification by these people did not fall under the spontaneous-declaration exception to the hearsay rule.

■ We further reject the State's arguments that this testimony was properly admitted because defendant failed to initially object to it, and it is therefore waived, or that its admission was cured by defendant's subsequent objection which the court sustained or that its admission was harmless error in light of the overwhelming evidence of defendant's guilt, especially the identification of defendant by several other witnesses. First, although a rule of evidence not invoked by timely objection is waived (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733), "the rule of waiver is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result" (*People v. Hoskins* (1984), 101 Ill. 2d 209, 219, 461 N.E.2d 941, quoting *Augsburg v. Frank's Car Wash, Inc.* (1982), 103 Ill. App. 3d 329, 333, 431 N.E.2d 58; *People v. Dickerson* (1983), 119 Ill. App. 3d 568, 571, 456 N.E.2d 920). Because of the cumulative impact of the unobjected-to and objected-to instances concerning this testimony, which will be further discussed in section II below, justice dictates we ignore waiver of this issue.

■ Secondly, we fail to comprehend the State's contention that admission of the initial testimony was cured when the court sustained defendant's later objection to the similar testimony of two State witnesses in light of the fact that the State repeatedly referred to this testimony in its closing and rebuttal arguments (see *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011) and, at one point, stated that the squadrol identification by the unnamed woman and crowd of people corroborated the identifications made by Essie Derringer, Daniel Rodriguez, and Victor Santiago.[1] As a result of admission of this testimony, we also note that even defense counsel contributed to adding weight to the testimony in her attempt to discredit the identifications as ones made by a mob of hysterical people. Under these circumstances, sustaining of defendant's later objections could not cure the prejudicial effect of this testimony. See *People v. Cepek* (1934), 357 Ill. 560, 570, 192 N.E. 573 ("The fact that the court sustained objections to the prejudicial statements did not cure the errors in the case. [Citation.] Driving a nail into a board and then pulling the nail out does not remove the hole").

■ Thirdly, although we agree with the State that admission of the testimony would be harmless error where it could not be said that it was a substitute for courtroom identification or used to strengthen or corroborate a weak identification (see *People v. Anthony* (1980), 90 Ill. App. 3d 859, 418 N.E.2d 757), we are not convinced that the jury

---

[1]Santiago, in fact, did not identify defendant as the shooter.

would have found Derringer's and Rodriguez' identification of defendant to be as strong, as the State contends, in the absence of the State's introduction and repeated exploitation of the squadrol identifications. At trial, it was disputed whether Derringer had told the police she was "pretty sure" but not positive about her identification of defendant and that she was hysterical after the shooting. The record also discloses that Rodriguez only saw defendant for approximately 10 seconds when he allegedly entered and left the tavern. In closing and rebuttal arguments, the State specifically stated that the squadrol identifications corroborated Derringer's and Rodriguez' identifications of defendant as the shooter. What weight the jury would have given to these facts without consideration of the squadrol identification testimony to strengthen and corroborate Derringer's and Rodriguez' identification of defendant cannot be determined. Moreover, as will be further discussed below, the admission of the squadrol identification testimony cannot be deemed harmless when considered in conjunction with the prosecutorial misconduct by the State in closing and rebuttal arguments.

## II

Defendant argues that the State's remarks in closing and rebuttal arguments shifted the burden of proof to defendant, constituted an accusation that defendant kept evidence from the jury, and were interjected to arouse the passions of the jury, thereby denying him his right to a fair trial. In response, the State contends that all its remarks were invited by statements of defense counsel and/or proper comments on the evidence and its natural inferences therefrom. Alternatively, it argues that if the remarks complained of were improper, all prejudice was cured by the sustaining of defendant's objections and the court's instructions to the jury to disregard the remarks or, if the prejudice was not cured, it was harmless error in light of the fact that the prejudice was not substantial, the comments were not a material factor in defendant's conviction, and there was overwhelming evidence of defendant's guilt. We disagree.

It is well settled that the prosecution has the burden of proving beyond a reasonable doubt all the material and essential facts constituting a crime committed by an accused. (*People v. Benson* (1960), 19 Ill. 2d 50, 166 N.E.2d 80.) Improper argument by the prosecution shifting the burden of proof to a defendant constitutes reversible error, notwithstanding the fact that the jury is otherwise properly instructed on the burden of proof. *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.

▆ In the instant case, defendant argues that he was prejudiced by the State's remarks in closing rebuttal argument concerning his "suggested modified alibi defense" made in opening argument by his counsel that he was in another tavern at the time of the shooting and was later being given a ride home by the occupants of the Monte Carlo when it was stopped by the police. Specifically, defendant contends that although his unsubstantiated recitation of facts in defense counsel's opening argument might have warranted argument that he had not presented the evidence set forth by counsel, the prosecutor's remarks went far beyond what was invited by his counsel and impermissibly shifted the burden of proof to him. The complained-of argument, made after the State argued to the jury that the case before it was about "uncontradiction" and that defendant had not presented any evidence supporting the allegations made in defense counsel's opening statement, is as follows:

"[Prosecutor]: Where is Jose Macias, Juan Mejia, Mario Reyna, Robert Reyna, Cesario Cisneros, Hugo Abarca, Jaime Cardenas, Chris Tobal Cardenas, Francisco Partida, Epifanio Alcaraz, where is Jose Esquibel, the alleged owner and driver of that car? Where are these people.

*** [Objection noted.]

[Prosecutor]: Let's go back. Let's go back to that. You know, you've heard about well, where are our witnesses? Where are those people that can clear the defendant?

*** [Objection sustained.]

[Prosecutor]: Where is Jose Esquibel who could state that the defendant was not in that car or in that tavern at 2:55 because he was with him?

[Defense Counsel]: Objection. There has been no testimony to that.

[Prosecutor]: Exactly.

*** [Objection sustained. Jury instructed to disregard.]"

"[W]here a defendant injects into the case the *name of an alibi witness* and then fails to call the witness, the prosecutor may legitimately comment on the lack of such evidence although it may not be relied upon as proof of the charge." (Emphasis added.) (*People v. Kubat* (1983), 94 Ill. 2d 437, 498, 447 N.E.2d 247.) The State contends that the above remarks were proper because defendant injected the existence of witnesses into the case to establish an alibi in his opening argument and, in any event, the remarks were harmless. It relies on *People v. Kane* (1980), 81 Ill. App. 3d 641, 401 N.E.2d 1310, where the court held that it was proper for the State to comment on the

defendant's failure to call alibi witnesses who were *named* in his list of possible witnesses and were mentioned by the defendant in his opening argument.

Unlike the circumstances in *Kane,* here there was no foundation for the State's remarks; defendant did not *name* any specific people in his opening argument, and the names read off by the State appeared in various pretrial discovery documents not in evidence. The first mention of these people occurred when the State introduced them in closing rebuttal argument. Under these facts, we find the State's remarks constituted more than comments that defendant had not presented evidence to support his "suggested" alibi. Naming the 11 witnesses not only suggested that they would have testified unfavorably against defendant, but the State's further remark, "Where are those people that can clear the defendant," shifted the burden of proof to defendant. We believe these statements were so substantially prejudicial that the taint of their prejudicial effect to defendant could not be cured by the sustaining of defendant's objections or by an instruction on the burden of proof. See *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.

Defendant also contends that the State compounded the prejudicial effect of the above comments by further remarks stating, in effect, that the rules of evidence prevented it from presenting additional relevant evidence, insinuating that the reason the absent witnesses did not testify was because they had been threatened by defendant, and accusing defendant of keeping evidence from the jury.

■ A remark that claims that the rules of evidence prevented the prosecutor from telling the jury relevant information is sufficient to constitute reversible error. (*People v. Lopez* (1980), 89 Ill. App. 3d 456, 411 N.E.2d 1071.) Argument by the prosecution that eyewitnesses did not testify because the defendant had intimidated or threatened them is clearly calculated to prejudice a defendant in the eyes of the jury. (*People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.) Comments creating the impression that defense counsel is keeping evidence from the jury have been held to constitute reversible error. *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926.

In the instant case, defendant complains of the following argument:

> "[Prosecutor]: Where are all our people? Now is that fair? How many times did I try to get in police officers to testify where these people are? Where are these witnesses who were in the tavern, these so-called eyewitnesses? My God, ladies and

gentlemen, who is objecting?

[Defense Counsel]: Objection, Judge.

[Prosecutor]: Wh . didn't want you to hear that evidence?

THE COURT: Objection overruled.

[Prosecutor]: Who didn't want you to hear that? How many times did I try to get that out?

[Defense Counsel]: Objection, your Honor. It's not that we didn't want this evidence before this jury. We just didn't want incompetent evidence before this jury.

THE COURT: Your point is well-taken ***.

[Prosecutor]: You saw yesterday we called Mr. Vercota [sic] our investigator. He was not allowed to testify.

[Defense Counsel]: Objection, Judge.

THE COURT: Objection is sustained. The jury is instructed to disregard.

[Prosecutor]: We did not have any witnesses when we started the evidence Tuesday. We interviewed Essie Derringer on Monday and she fled. And she told you why she fled. She was here Monday night. She got scared. Now I cannot go into any more of that. I can't tell you why she was afraid or why any of these other people were afraid.

[Defense Counsel]: I am now objecting, Judge.

THE COURT: Objection is sustained to any other people.

[Prosecutor]: But she was afraid. She left and went back to Ohio. But but I submit to you that even without Essie Derringer we proved our case and my partner told you—he went over the evidence."

The State contends that these remarks were invited by defense counsel in her closing argument when she stated that "[o]ut of the 30 to 35 people who were in that tavern, only one person came in here and said she saw who did the shooting. One person." The State further argues that it "never actually accused the defendant of keeping evidence from the jury" and that the remarks were proper comments on the evidence to explain the absence of certain witnesses.

We find the State's arguments without merit. The statements that "how many times did I try to get in police officers to testify where these people are," "who didn't want you to hear that evidence," and "you saw yesterday we called Mr. Vercota our investigator" and "he was not allowed to testify," clearly constituted a claim that the rules of evidence prevented the State from telling the jury relevant information and an accusation that defendant kept evidence from the jury by preventing the State from securing the alleged tavern eyewit-

nesses against defendant. The State also clearly insinuated that defendant had threatened or intimidated other witnesses because they, like Derringer, were afraid to "come in" and testify against defendant. In fact, the State admits in its appellate brief that it intended to imply that if Derringer was afraid to testify, it was reasonable to assume that the absent witnesses were afraid as well. The State fearlessly admits this fact with the explanation that the context in which "afraid" was used is ambiguous and that no attempt was made by it to explain why Derringer or any other witnesses were afraid. This argument, like the explanation by the State that it never actually accused defendant of keeping evidence from the jury, is specious and the excerpted passage cannot withstand the intended effect on the jury when read in its entirety. The logical inference is that Derringer and the other tavern witnesses were afraid of defendant.

We also briefly note that the State's remarks, that Derringer was "cut off" by defense counsel before she could testify that she had not stated to the police she was "pretty sure, but not positive" that defendant was the shooter, constituted a further accusation that defendant was keeping evidence from the jury, thereby adding fuel to its previous comments to this effect.

■■■ Defendant's last argument concerns the State's closing rebuttal remarks about the hearsay squadrol identification testimony discussed in section I of this opinion. In argument, the State told the jury as follows:

"[Prosecutor]: What other evidence do you have concerning this defendant? Well, again you had that he was brought to the scene in the paddy wagon, some people were screaming. Now the defense attorney argues that there was a hysterical mob scene. Now when I objected to her argument—the question, and I know you remember it: Were the people extremely hysterical when you brought the defendant back to the scene and the answer was yes, and there was reason for that and you know the reason. Using your own common sense, you know the reason why they were hysterical.

As my partner pointed out they weren't hysterical during the argument several hours earlier over the beer. They weren't hysterical prior to the shooting. They had an opportunity to observe. Only hysterical after a man gets his brains blown away."

We do not believe this line of argument was an inadvertent error; the squadrol identification testimony had been objected to twice and sustained, and the State had acknowledged that it was hearsay to allow testimony as to what the unnamed woman and crowd of people had

said. Stating in argument that these people "screamed" had the same effect that stating that these people screamed, "that's him, that's him," would have .had. Stating that the people were understandably hysterical after seeing a man get "his brains blown away" was calculated to inflame the passions of the jury, further impressing upon their minds consideration of the squadrol identification. Instead of two identification witnesses, Derringer and Rodriguez, the State in effect was telling the jury that at least 14 people identified defendant as the shooter. Add to this the State's remarks that its witnesses "over and over again told you [the jury] who the shooter was" and "I wish I could have put on all of those people but we didn't have them," and the cumulative impact of the remarks resulted in substantial prejudice to defendant.

In light of the above, we therefore hold that the prosecutorial comments discussed herein constituted reversible error; taken as a whole, we cannot say that these comments were harmless beyond a reasonable doubt or did not materially contribute to defendant's conviction. (See *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.) Regardless of a defendant's guilt or innocence, he is constitutionally entitled to a fair and impartial trial (*People v. Savage* (1967), 84 Ill. App. 2d 73, 228 N.E.2d 215); here, defendant did not receive one. Accordingly, we reverse and remand this case for a new trial.

Because of the foregoing disposition, it is unnecessary to address defendant's additional arguments concerning other improper argument made by the State or the remaining issues raised on appeal. We further note our belief that the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather that our conclusion as to the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

Reversed and remanded.

SULLIVAN, P.J., and PINCHAM, J., concur.