2021 IL App (2d) 191030-U
No. 2-19-1030
Order filed September 24, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-133 |
| ANTHONY V. STULGA, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The State proved beyond a reasonable doubt that defendant committed criminal sexual abuse by masturbating while the victim was asleep and ejaculating on her immediately after she woke and before she could consent. Also, though it was error for the State to argue in rebuttal that the defense should have produced stronger evidence of the victim's reputation for dishonesty, the error was not reversible error.

¶ 2    Defendant, Anthony V. Stulga, appeals from his conviction, following a bench trial, of one count of criminal sexual abuse (720 ILCS 5/11-1.50(a)(2) (West 2016)). The State's theory at trial was that defendant approached the victim, C.B., while she was asleep and ejaculated on her face and chest after she awakened but before she was fully aware of the situation; thus, according to

the State, she was unable to consent to the act. Defendant contends first that the State failed to present sufficient evidence of his guilt. He argues that, given C.B.'s admitted apprehension about defendant, she would not have fallen asleep in his presence. Second, he contends that the trial court committed reversible error in overruling his objection to the State's rebuttal argument—that, defendant should have called more convincing witnesses than defendant's sister-in-law to testify that C.B. had a poor reputation for honesty in the community. We conclude that the evidence was sufficient to convict defendant and that any error in permitting the State to make its argument was not reversible. We therefore affirm.

¶ 3                                I. BACKGROUND

¶ 4     Defendant was charged by information with a single count of criminal sexual abuse, which alleged that, on December 30, 2016, "defendant, knowing that C.B. was unable to give knowing consent, committed an act of sexual conduct with C.B., in that the defendant knowingly ejaculated onto C.B.'s face for the purpose of the sexual arousal or gratification of the defendant."

¶ 5     The evidence at trial showed that, in December 2016, C.B. and defendant were employees of Alta Equipment Company's Montgomery branch. C.B. was a service dispatcher and her shift was 7 a.m. to 4 p.m. Her immediate supervisor was Christopher Baima, and his supervisor was defendant, the branch manager. On December 29, 2016, a group of Alta employees, including C.B. and defendant, decided to meet after work at the Tap House in Oswego. Defendant drank heavily. The evidence was inconsistent as to how much C.B. drank, but all witnesses agreed that she drank much less than defendant.

¶ 6     C.B. testified that, on December 29, 2016, she drove to the Tap House after she finished her shift. Her payday was December 30; she was short of money and could buy only one drink. She did not recall anyone buying a drink for her. At about 11:45 p.m., she started getting ready to

go home. She heard defendant say that he did not have money for a cab or a hotel and would drive somewhere. C.B. could see that defendant was too intoxicated to drive. C.B. discussed with her coworkers how defendant would get home and whether someone should host him for the night. C.B. offered to let defendant sleep on her sofa and drive him back to his car the next morning. Defendant agreed.

¶ 7     When the two arrived at C.B.'s house, her daughters were in the living room, but they went upstairs to their rooms about ten minutes later. Defendant asked for more alcohol; C.B. declined to give him any. However, after she left the room briefly, she found that defendant was drinking a beer that he had taken from her refrigerator. Defendant was "dancing in the living room, being silly, *** talking nonsense, just talking." She tried "to get him to settle down to stop drinking." Instead, he drank two more beers from her refrigerator.

¶ 8     Around 1 a.m., defendant lay down on the sofa bed in the living room. He was wearing a shirt, slacks, and socks. C.B. went to her upstairs bedroom to sleep. She wore yoga pants, a long-sleeved shirt with a sports bra underneath, and socks.

¶ 9     C.B. awakened when defendant walked into her room and asked her to let him outside to smoke. He could not let himself out because the door locks required a key. When defendant refused to return to bed, C.G. got up to open the door for him. Defendant was no longer wearing pants—just a T-shirt, underpants, and socks. C.B. told him to put his pants on. He refused, saying that he could not sleep with his pants on. She let him outside to smoke. While he was outside, C.B. noticed more empty beer bottles in the living room, for a total of four.

¶ 10     When defendant came back inside, she told him again to put his pants on, but he did not. The two had "a conversation of sorts," during which C.B. sat in a recliner and defendant danced around the living room. C.B. remained on the first floor because she was "concerned about

[defendant] coming back up the stairs." Defendant "was behaving drunk, and [she] was concerned for the safety of [her] children." Defendant asked her if she noticed that he was not wearing pants. He also commented that she had "nice tits," and asked if he could see them and touch them. She said no. He then remarked that she had a "pretty little pussy," and asked if she liked to touch it. She said no. He then "indicated that he needed to masturbate." C.B. replied that, if defendant needed to do so, he should go into the bathroom. C.B. continued to stay on the first floor "so [defendant] wouldn't go back upstairs." She was "concern[ed]" for her children because C.B. refused to put his pants on. She further testified:

> "Q. What did you do because of your concern about him walking around in his underwear?
>
> A. I was still trying to get him just to go to sleep so that I could drive him back to his car, back to work. I was more concerned about him going to sleep to sleep off some of the alcohol he had consumed.
>
> Q. More concerned about him going to sleep than him being in his underwear in your home with your kids upstairs?
>
> A. Yes."

¶ 11 C.B. testified that she had told her children to stay upstairs "[b]ecause [defendant] was drunk, and [she] didn't want them to have to witness or deal with that." Later, when asked what she was "afraid of," C.B. reiterated that she "wanted to make sure [defendant] didn't go back upstairs." She was trying to "protect" her children. According to C.B., defendant was about six feet, four inches tall, and weighed about 270 pounds.

¶ 12    C.B. testified that she conversed with defendant for about an hour before falling asleep at about 4:30 a.m.  She woke to see defendant standing over her, masturbating.  She asked him what he was doing, and he said he wanted to see her "pretty titties" and "nice pussy."  She continued:

> "I said, what are you doing, no.  And he said, too late, and he came on my face and hair and the blanket."

She discovered that she was stuck in the recliner because she could not reach the handle to raise the chair from its reclined position.  Defendant grabbed the back of her head and tried to pull it towards his penis.  He also tried to touch her breasts and between her legs, but she curled into a ball to resist.

¶ 13    C.B. eventually rose from the recliner and said, "[G]et dressed. We're leaving."  She went upstairs to put on her clothes.  When she returned, defendant was lying under the covers on the sofa bed and appeared to be masturbating.  He said, "I'm ready for round two if you are." She noticed yet another empty beer bottle.  She told defendant to get dressed.  She drove him home in her car.  During the drive, he continued to masturbate, grabbing her arm several times to try to make her touch his penis.  When they arrived at his house, she helped him out and to the front door.

¶ 14    After C.B. brought defendant home, she went to work despite not being scheduled for a shift.  She stayed for a few hours, spoke to her immediate supervisor, and then went home.  That evening, after talking to her parents, she contacted the Yorkville police about what defendant had done.  C.B. testified that she never consented to any sexual contact between her and defendant.

¶ 15    The State presented testimony that DNA extracted from semen found on C.B.'s shirt matched defendant.

¶ 16    Christina Paus, defendant's sister-in-law, testified for the defense. She also worked at Alta in December 2016, having started there in March 2016. She was the service administrator and had daily contact with C.B. Through their contact at work, Paus became aware of C.B.'s reputation for truthfulness. Paus had "experienced personal instances relative to [C.B.'s] credibility, her telling the truth." In her opinion, C.B. was not truthful. Paus was not permitted to testify to specific examples of C.B.'s untruthfulness.

¶ 17    Paus was part of the gathering at the Tap House on December 29, 2016. She sat at the same table as C.B. C.B. was trying different types of craft beers. Paus knew that C.B. ordered more than two beers, but Paus was not sure how many. Later, someone bought a round for the group, and C.B. had that drink as well.

¶ 18    Paus testified that the group eventually discussed where defendant should spend the night. C.B. insisted that defendant come home with her and argued against other suggestions, such as someone driving defendant to a hotel. When Paus saw C.B. the next day at work, C.B. said that defendant had been an "ass" and had drunk all her alcohol. However, she seemed to be amused.

¶ 19    Defendant testified that he left Alta at about 5 p.m. on January 29, 2016. After stopping at an ATM to get $200, he went to the Tap House. Before joining his coworkers at their table, he ordered a beer and a shot for himself at the bar. Sometime that night, he called his wife to say that he would get a hotel room. Though he planned to drive himself to the hotel, he nevertheless kept drinking. He paid for a last round of drinks for the Alta employees at the Tap House.

¶ 20    As the gathering broke up, he told his coworkers that he planned to get a hotel room. C.B. suggested three or four times that defendant sleep at her house. He was initially resistant because he was C.B.'s supervisor and, that aside, he did not want to sleep on a sofa. However, he knew

that he could not drive, and other options, such as staying with Paus, were not available. When C.B. explained that she had a comfortable sofa bed, he accepted her offer.

¶ 21    On the way to C.B.'s house, there was a brief conversation of a "mild" sexual nature. C.B. did not object to this conversation. The discussion then turned to her work performance. Defendant said that he was pleased that C.B. had "upped her game" in recent months, as her performance had needed improvement. He remarked that she had received "a better than standard raise" for her increased efforts.

¶ 22    Defendant called his wife as soon as he reached C.B.'s house. His wife wanted to take him home, but C.B. refused to provide her address, telling defendant that his wife should not have to come over in the middle of the night. Defendant then asked whether C.B. had any alcohol. She said that she did, and one of her daughters brought defendant a glass of red wine. After that, C.B.'s daughters went to bed, and defendant and C.B. started a wide-ranging conversation. They talked for about two hours, and then C.B. excused herself to go to bed.

¶ 23    Defendant went to look for more alcohol but could not find any, so he decided to go to bed. He took his pants off and lay down, but he could not sleep. After about 45 minutes, he decided that he needed to smoke and tried to go outside through the front door. He could not open the door because the locks required a key. He went upstairs to C.B.'s bedroom, woke her, and asked her to unlock the door. She came down, opened the door, and stayed there while he was outside smoking. When he came back in, she commented that he was not wearing pants. He replied that he did not normally sleep in pants. She did not ask him to put his pants on. C.B. sat in the recliner, and they started talking again. Defendant "turned the conversation toward a sexual nature." He asked C.B. sexual questions, and she answered without protest. They conversed for about an hour, with some sexual elements interspersed among other subjects.

¶ 24    Defendant left to use the bathroom. When defendant returned, he told C.B. that he could not get to sleep and that he "need[ed] to get off or something." She told him to "go ahead." He asked if she was sure, and she said she was. Defendant then fondled himself through his underwear while C.B. watched him. He asked if he could "see her tits." C.B. "looked at [him], paused for a few seconds, looked [him] in the eyes, and then she pulled out her left breast." C.B. "cupped her left breast with her left hand and was playing with her nipples with her right." Defendant then exposed his penis. After a few minutes, C.B. said that she would "pull out the bigger one," and she pulled her bra down to expose both breasts. Defendant continued to masturbate, both while standing and while sitting on the sofa bed. At one point, he touched C.B.'s left nipple with his hand. Eventually, he reached orgasm while he was standing; the ejaculate went across C.B.'s chest. She grabbed a towel or rag and cleaned her chest. "And then it got a little awkward there for a very short time, and then we talked for maybe 30 seconds or a minute." C.B. went upstairs briefly and returned in different clothing. Defendant also dressed to leave.

¶ 25    The two left in C.B.'s car. As C.B. pulled away from her house, defendant told her, "I could go for another nut." She told him to go ahead, so he pulled out his penis and started masturbating again. He stopped while they were at a gas station and resumed when they started driving again. Eventually, he stopped, but at no one time during the drive did C.B. tell him to stop. As they approached his house, C.B. turned to him and said, "[T]his will be our little secret." When they arrived at defendant's house, he had no difficulty walking to the door, but C.B. still got out with him. He could not find his keys to get in. His wife came to the door before he could open it for himself.

¶ 26    The defense called two other employees of Alta—Baima and Patrick Wagner—who testified about the gathering at the Tap House.

¶ 27    In closing, the State argued that defendant took advantage of C.B.'s good intentions in keeping him from driving drunk. The State asserted that it proved lack of consent. Defendant began masturbating while C.B. was asleep. When defendant ejaculated, C.B. was "[b]arely awake" and thus could not give consent.

¶ 28    Defendant, in contrast, argued that the evidence showed "a liaison that occurred between two employees." Defendant proposed that C.B. would not have fallen asleep if, as she claimed, she was intent on protecting her children from defendant.

¶ 29    In rebuttal, the State discussed Paus's testimony about C.B.'s reputation for truthfulness:

> "Let's talk about Christina Paus. *** She gets up here in an attempt to drag [C.B's] good name through the mud, and that's all it was. *** This so-called reputation evidence that you heard, her opinion about [C.B.'s] reputation.
>
> Think about that for a second, because reputation evidence has to be in a community. Well, it can't be in [their] school community. They never went to school together. It can't be in the social community, because she told you, we're not [on] social media together, we don't socialize. It can't be in the neighborhood, because there's no evidence they live in the same neighborhood. So it has to be the work community. That's the only place from which this so-called reputation evidence could have been drawn. And Ms. Paus says, well, in my opinion, she has a reputation for dishonesty. She doesn't tell the truth.
>
> Now, I will concede right here, we have the burden of proof. *** But to consider the reasonableness of Christina Paus's testimony, I ask you, why didn't Chris Baima tell us about [C.B.'s] reputation? He works in the same place. Why didn't Patrick Wagner tell

us about [C.B.'s] reputation? He works in the same place. The defendant testified. Why didn't he tell us about [C.B.'s] reputation? He works in the same [place].

MR. TOMCZAK [DEFENSE ATTORNEY]: Judge, I'm going to object to the nature of this argument. I think he's shifting the burden.

THE COURT: Well, all right. Your objection is noted.

You can continue, Mr. Shlifka.

MR. SHLIFKA [ASSISTANT STATE'S ATTORNEY]: Not only did he not tell us that [C.B.] has a reputation for dishonesty. He told us she was working great and just got a raise. That's what I want you to consider when you consider the credibility of Christina Paus when she told you about that type of evidence."

¶ 30   The court found defendant guilty of the charged offense. Defendant filed a posttrial motion asserting, among other things, that the State had improperly shifted the burden of proof in its rebuttal comments on Paus's testimony. Addressing that aspect of the motion, the court commented:

"[W]hatever specifically was said during closing arguments are again arguments regarding what counsel believes the evidence shows, a reasonable inference that show[s] it's not evidence. And certainly the Court's well aware that it's the State's burden, it does not ever shift to the defendant. So, the defendant had no obligation to prove or disprove anything."

¶ 31   The court denied the motion and sentenced defendant to probation. Defendant filed a timely notice of appeal.

¶ 32                                    II. ANALYSIS

¶ 33   On appeal, defendant first argues that the State's proof of lack of consent was inadequate because it depended on the implausible suggestion that C.B. fell asleep while perceiving defendant

as a potential threat to her children.  Second, he argues that it was reversible error for the court to allow the State to argue that defendant should have presented additional witnesses to show that C.B. had a reputation for dishonesty in the community.

¶ 34     We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985).  When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)  *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319).  "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution."  *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

> "[T]he reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. [Citation.]  But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision.  A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt."  *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

The State is not required to present evidence that excludes every reasonable hypothesis of the defendant's innocence.  *E.g.*, *People v. Larson*, 379 Ill. App. 3d 642, 654 (2008).

¶ 35     The gist of defendant's argument is that, if C.B. were telling the truth about what happened at her home, it would be unreasonable to believe that she could have fallen asleep with defendant

in the house. Emphasizing C.B.'s description of defendant's imposing physical size and her concern that he would return upstairs where her daughters were sleeping, defendant suggests that C.B.'s testimony that she nonetheless fell asleep was so improbable that a reasonable doubt about his guilt remained.

¶ 36 We disagree. Defendant's argument requires inferences about C.B.'s state of mind that are unsupported by the evidence. Defendant correctly points out that, when asked what she was "afraid of," C.B. replied, "I wanted to make sure [that defendant] didn't go back upstairs." It is not clear that C.B. was acknowledging that she was "afraid of" defendant going back upstairs, but even if she was, it is far from clear that she was admitting to actual fear of defendant. Nowhere else in her testimony did C.B. use "afraid" or a kindred term to describe how she felt about defendant. Instead, she almost exclusively used "concern"—or approved her questioner's use of that term—to describe her emotion at the prospect of defendant going back upstairs. Concern is, in ordinary usage, a milder emotion than fear.

¶ 37 As for what, precisely, C.B. was concerned about, we recognize that she testified that she was concerned about her children's "safety" and wanted to "protect" them. However, she never suggested that she viewed defendant as capable of intentionally harming her children. Notably, she admitted that she was more concerned about persuading defendant to sleep off his intoxication and get him home than keeping him from going back upstairs. Her predominant concern appeared to be that defendant was drunk and not wearing pants. She told her children to remain upstairs "[b]ecause [defendant] was drunk, and [she] didn't want them to have to witness or deal with that." It was reasonable to infer that she viewed defendant more as an embarrassment than a threat and that she primarily wished to spare her children the spectacle of defendant's antics and state of partial undress. Nothing suggests that C.B. was in such desperation over her children that she

could not have fallen asleep, particularly at 4:30 a.m. after a restless night. At the very least, the trial court's finding that C.B. fell asleep with defendant in the home was not so unreasonable, improbable, or unsatisfactory that a reasonable doubt of defendant's guilt necessarily remained.

¶ 38    Furthermore, if C.B. had set out to falsely incriminate defendant, she could have plausibly claimed that he masturbated over her while keeping her in the recliner with threats or force. This accusation would have portrayed her as a more conventional victim. Her testimony that she was asleep until just before defendant ejaculated fueled defense counsel's argument that the night was a "liaison" that she had sought out. C.B.'s account was not what a person would pick if she wanted to make herself the clearest possible victim. For the foregoing reasons, we reject defendant's challenge to the sufficiency of the evidence.

¶ 39    Defendant next contends that the State, in its rebuttal argument, improperly shifted the burden of proof to him and that the trial court's failure to sustain the defense objection was reversible error. The State responds that we should reject this claim for several reasons. The most important reason is that defendant was not denied justice. The court, as the trier of fact, addressed defendant's claim of burden shifting and stressed that it understood that the State had the burden from first to last. We agree with defendant that the State's comments were error, but we disagree that the error is reversible.

¶ 40    The State is afforded wide, but not unlimited, latitude in closing argument. *People v. Luna*, 2013 IL App (1st) 072253, ¶ 125. "[A] prosecutor must not state that the defendant has an obligation to come forward with evidence that would create a reasonable doubt as to his guilt." *Luna*, 2013 IL App (1st) 072253, ¶ 129; see also *People v. Albanese*, 104 Ill. 2d 504, 522, (1984) (applying the same rule). But the State may properly point out a "defendant's failure to submit any evidence that would tend to refute the case against him." *Albanese*, 104 Ill. 2d at 522.

Reviewing courts will consider the closing argument as a whole, rather than focus on selected phrases or remarks. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). "A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83.

¶ 41 As we recently recognized, "there is an apparent conflict regarding the proper standard of review for claims of improper closing argument." *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 117. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), the supreme court applied the *de novo* standard of review, but in *People v. Blue*, 189 Ill. 2d 99, 128, (2000), the court applied the abuse-of-discretion standard. We need not resolve the conflict here, as we would affirm under either standard.

¶ 42 Defendant relies on *People v. Clark*, 186 Ill. App. 3d 109 (1989), which holds that it is improper for the State to make comments that "emphasize[] the defense's failure to produce *certain* evidence." (Emphasis added.) *Clark*, 186 Ill. App. 3d at 115. We assume solely for the sake of argument that *Clark* court's statement of the law is correct, and we agree with defendant that the State's comments were improper under the *Clark* standard. But while we find error, we hold that the error was not *reversible* error.

¶ 43 In *Clark*, police officers on patrol observed a commotion and saw the defendant walking in the middle of a street. After a confrontation with the police, the defendant was arrested for disorderly conduct. A handgun was found in his coat pocket. At the defendant's jury trial on the charge of unlawful possession of a handgun by a felon, the defense called the defendant's girlfriend, Janet Horn. She testified that she lived with the defendant in Palatine. She had purchased the handgun and placed it in the defendant's coat without telling him. On the morning

of his arrest, the defendant told Horn that he planned to go to Chicago. She called a cab for the defendant, and he left wearing the coat. In closing argument, the prosecutor commented, " 'I don't know what Lucius Clark was doing that day. I haven't seen any taxicab receipts. I haven't seen any Northwestern receipts.' " *Clark*, 186 Ill. App. 3d at 115. The defendant was convicted. On appeal, the court held that the State's comment "improperly shifted the burden of proof to defendant by emphasizing [the] defendant's lack of evidence." *Clark*, 186 Ill. App. 3d at 115. It analogized the State's comments to those found improper in prior cases: " '[w]here are those people that can clear the defendant?' " (*Clark*, 186 Ill. App. 3d at 115 (quoting *People v. Lopez*, 152 Ill. App. 3d 667, 678 (1987)) and " '[n]ow where's the evidence that the defendant didn't do it?' " (*Clark*, 186 Ill. App. 3d at 115 (quoting *People v. Giangrande*, 101 Ill. App. 3d 397, 402 (1981)). Here, as in *Clark*, the State pointed to specific evidence that the defense might have produced to strengthen its case but did not. Under *Clark*, the State's comments were improper.

¶ 44     However, the comments were not reversible error under *Clark*. Specifically, the comments were not so prejudicial that real justice was denied or the verdict resulted from the error. First, the comments in *Clark* were grounds for reversal in conjunction with other improper comments by the State. See *Clark*, 186 Ill. App. 3d at 116. Defendant here claims only a single error. Second, the trial here was a bench trial, not a jury trial as in *Clark*. Third, a court is presumed to know the law and apply it properly, including the State's burden of proof. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 28. That presumption can be rebutted by "strong affirmative evidence to the contrary" in the record. *Cameron*, 2012 IL App (3d) 110020, ¶ 28. In denying defendant's posttrial motion, the court expressly noted that it was aware that the burden of proof remains on the State from start to finish. Moreover, there is no affirmative indication in the record that the court misapplied the burden of proof.

¶ 45                              III. CONCLUSION

¶ 46    For the reasons stated, we affirm the judgment of the Circuit Court of Kendall County.

¶ 47    Affirmed.