THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE MALAVE, Defendant-Appellant.

First District (4th Division)   No. 1—89—3398

Opinion filed May 28, 1992.—Rehearing denied June 23, 1992.

Randolph N. Stone, Public Defender, of Chicago (Cheryl K. Lipton and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Jose Malave, was convicted of first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) following a jury trial in the circuit court of Cook County. The trial judge sentenced defendant to the penitentiary for a term of 50 years.

Defendant appeals, contending he was denied a fair trial because: (1) the trial judge admitted into evidence certain hearsay statements, and (2) the prosecutor made inflammatory remarks during the State's case and closing argument. Defendant also contends (3) the trial judge erred in determining the sentence.

We affirm the judgment of the trial court.

BACKGROUND

The record contains the following pertinent facts. Defendant was indicted on three counts of murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1) through (a)(3)), one count of armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2), and one count of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A).

The State's case at trial was essentially as follows. Humboldt Park is bordered by North Avenue, Division Street, California and

Kedzie Avenues in Chicago. Humboldt Boulevard bisects the park. Two belligerent groups of street gangs occupy the park. The "People," which includes the Latin Kings, occupies the west side of the park; the "Folks," which includes the Latin Jivers and several other street gangs, occupies the east side of the park. Defendant was a member of the Latin Jivers, affiliated with the "Folks." The victim, Jorge Sanchez, also known as Victor, was a member of the Latin Kings, affiliated with the "People."

On the night of June 26, 1988, Nathan Iverson and Mario Munoz were together in Humboldt Park. They saw the victim, on the west side of Humboldt Boulevard, shouting gang slogans and curses at the "Folks" on the east side of the street. The "Folks" responded by shouting insults at the victim. Later that night, Munoz was in the west side of the park with the victim's cousin Roberto. The victim approached them and borrowed Roberto's bicycle. The victim rode the bicycle toward the boathouse on the east side of Humboldt Boulevard, where the "Folks" gathered.

The victim stood near the boathouse. A man, wearing black clothing, approached the victim from behind, tapped him on the shoulder, and shot the victim twice. The shooter ran from the scene; the victim began to run but fell to the ground. The victim died a short time later as the result of the gunshot wounds.

Chicago police officer Michael Conley and his partner were patrolling the area at approximately 7:45 p.m. that night. At that time they heard a police radio bulletin of a shooting in the park. They immediately went to the scene, where they found the victim bleeding from two bullet wounds. Onlookers shouted that the victim was a Latin King and gave the officers a tip that the shooter wore black clothing. The officers searched the area and saw defendant, dressed completely in black, riding a motorscooter. They stopped defendant and retrieved a witness from the crime scene to identify defendant as the shooter. However, the witness could not identify defendant, so the officers released him.

On June 28, 1988, Chicago police officer Clyde Raymond received an anonymous telephone tip that the shooter was "Primo J." Raymond knew defendant as "Primo J.," whom he had seen on many prior occasions.

On June 30, 1988, at approximately 1:30 a.m., Officer Raymond, with Chicago police officer Frank Vukonich and Sergeant Mingy, went to defendant's home. They spoke with defendant and his mother. The officers asked defendant to accompany them to Area 5 police headquarters for questioning and defendant agreed. At the police station,

after being informed of his *Miranda* rights, defendant at first stated that he did not know anything about the shooting.

Defendant was interviewed again at approximately 12:30 p.m. After again being informed of his *Miranda* rights, defendant confessed that he shot the victim. Defendant made an oral statement to Chicago police detective Richard Curley. Defendant's statement is as follows. On the night of the shooting, several of defendant's fellow gang members informed defendant that rival gang members were in his gang's territory. Defendant told his companions to return to the rival gang and he would meet them there. Defendant then retrieved a loaded 380 automatic pistol.

When defendant met his companions, they were in a shouting match with some Latin Kings. One Latin King, who was the victim, stood off to one side of the group, near the boathouse. The victim was taunting defendant. Defendant then stalked the victim, approaching him from behind. When defendant finally made contact, he said something to the victim. The victim turned to face defendant, while at the same time reaching for his waist. Defendant then shot the victim, took the victim's bicycle, fled from the crime scene, and hid the bicycle and the gun. Defendant then rode a motorscooter through the area.

At approximately 2:15 p.m., defendant repeated this statement to then Assistant State's Attorney Delcine Thompson. Thompson and Curley then spoke with Louis Vargas, also known as "Pito," who was another member of defendant's gang. Vargas told Thompson and Curley that at no time did the victim have a gun.

Thompson and Curley then confronted defendant with Vargas' statement. After again being informed of his *Miranda* rights, defendant told them that Vargas spoke truthfully. Defendant essentially repeated his statement made to Curley. Defendant added that at no time did he actually see a gun on the victim's person at the time of the shooting. In his signed, written statement, taken at approximately 6 p.m., defendant stated that he thought the victim had a pistol, but he did not actually see any.

Police retrieved the pistol where defendant said he hid it. The State presented evidence that the bullets removed from the victim's body could have been fired from the pistol. The police department's firearms examiner opined that the bullets were too mutilated to make an exact match. However, he also opined that "class characteristics" of the fired bullets were "consistent" with the bullets having been fired from the pistol.

The defense case was essentially that defendant acted in self-defense. When defendant made his 12:30 p.m. statement to Detective Curley, defendant stated that he saw the victim holding a "small, dark-colored gun" during their shouting match. Defendant believed that the victim was reaching for a gun at his waist while he turned to face defendant.

On cross-examination by the State, Detective Curley related the substance of Vargas' statement for the first time during trial. Curley testified that Vargas told him and Thompson that at no time did the victim have a gun. Further, when confronted with Vargas' statement, defendant told them that Vargas told the truth.

The jury convicted defendant of first-degree murder, and acquitted him of armed robbery and first-degree murder based on the commission of the armed robbery. At the sentencing hearing, the trial judge denied defendant's post-trial motion. At the close of the hearing, the trial judge sentenced defendant to 50 years on one count of murder. (See *People v. Hood* (1989), 191 Ill. App. 3d 129, 134, 547 N.E.2d 637, 641.) Defendant appeals.

OPINION

## I

### A

Defendant first contends that the trial judge erred by admitting into evidence Vargas' out-of-court statement, as told by Curley, that the victim did not have a gun at anytime. Defendant argues that Vargas' out-of-court statement constituted hearsay and, therefore, was inadmissible. Defendant alternatively argues that the admission of the statement denied his constitutional right to confront the witnesses against him and that the statement was irrelevant to his claim of self-defense.

Hearsay is testimony in court or written evidence of an out-of-court statement, offered to establish the truth of the matter asserted therein and, thus, resting for its value upon the credibility of the out-of-court asserter. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741.) However, an out-of-court statement not offered for the truth of the matter asserted is not hearsay. *People v. Loggins* (1985), 134 Ill. App. 3d 684, 692, 480 N.E.2d 1293, 1299.

A statement used in a criminal prosecution to detail the course of a police investigation, not to prove the truth of the matter asserted, is not hearsay. (*Loggins*, 134 Ill. App. 3d at 692, 480 N.E.2d at 1299.)

Such a statement is admissible if offered for the limited purpose of explaining why the police conducted their investigation as they did, or why they arrested defendant, or why they confronted defendant with their suspicions. (*People v. Jones* (1986), 140 Ill. App. 3d 660, 673, 488 N.E.2d 1363, 1372; *People v. Jones* (1983), 114 Ill. App. 3d 576, 589, 449 N.E.2d 547, 557-58.) The rationale of the rule is that a portrayal of the events in question lessens the need of the fact finder to speculate on the reasons for the officers' subsequent actions. The rule thus serves the ends of justice. *State v. Brooks* (Mo. 1981), 618 S.W.2d 22, 25.

■ Applying these principles to the case at bar, we conclude that Vargas' out-of-court statement was relevant and admissible non-hearsay. At the outset we note that defendant misreads the record. Defendant contends that both Detective Curley and then Assistant State's Attorney Thompson related Vargas' statement. However, the record shows that only Curley, testifying for the defense and during the State's cross-examination, actually told what Vargas said. Thompson did not relate Vargas' statement. Rather, she merely testified that she spoke with Vargas and then confronted defendant with Vargas' statement. Therefore, there is no discernible hearsay problem with Thompson's testimony. See *People v. Bennett* (1987), 159 Ill. App. 3d 172, 180, 511 N.E.2d 1340, 1345.

Defendant contends Vargas' statement was admitted "as positive evidence that [the victim] did not have a gun." However, the record shows that Curley did not offer Vargas' statement to prove that the victim did not have a gun. Rather, Curley related Vargas' statement to explain why he and Thompson confronted defendant with their suspicions. Thus, the evidence was relevant for that purpose and defendant's constitutional right of confrontation was not violated. As we stated in *People v. Matthews* (1990), 205 Ill. App. 3d 371, 562 N.E.2d 1113:

> "It is clear from the record that the testimony was being offered to describe the process and development of the investigation and the subsequent interrogations of the defendant while he was in custody. Because it was not offered for the truth of the matter asserted, the testimony is not inadmissible hearsay and its admission was not prejudicial error. [Citation.]" 205 Ill. App. 3d at 412, 562 N.E.2d at 1137-38.

## B

Defendant also contends that the trial court erred by restricting his right of cross-examination. Defendant notes that the trial judge al-

lowed Thompson to refer to Vargas' statement and defendant's reaction to Vargas' statement. Defendant further notes, however, that the trial judge did not allow defendant to cross-examine Thompson regarding the substance of Vargas' statement. Defendant argues that this was error.

■ It is true "that additional portions of a statement must be admitted when necessary to prevent the jury from receiving a misleading impression as to the nature of the statement." (*People v. Olinger* (1986), 112 Ill. 2d 324, 337, 493 N.E.2d 579, 586, citing *People v. Weaver* (1982), 92 Ill. 2d 545, 556-57, 442 N.E.2d 255, 259.) However, "[a] defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State." *Olinger*, 112 Ill. 2d at 338, 493 N.E.2d at 586.

In the case at bar, defendant does not argue that Thompson's testimony was misleading. Rather, defendant merely makes the blanket assertion that "once a witness testifies to a part of a conversation, the opposing party has a right to bring out all of the conversation on cross-examination." *Olinger* holds otherwise. Since defendant does not argue that Thompson's testimony was misleading, we find no error in the trial judge's ruling.

## II

Defendant next contends he was denied a fair trial due to the prosecutor's inflammatory remarks during the State's case and closing argument.

## A

Defendant notes that at the beginning of the direct examinations of Maria Martinez, Nathan Iverson, and Mario Munoz, the prosecutor asked each of them: "Without telling us your exact address, do you live in the city of Chicago?" or "Without telling us your exact address, what area of the city do you live in, Sir?" Defendant also notes that the prosecutor asked Iverson, "Without telling us what school you go to, what grade are you in?" Defendant argues that these remarks "were inflammatory and caused the defendant substantial prejudice."

■ However, defendant failed both to object to this questioning at trial and to include the issue in his post-trial motion; thus, the issue is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) After reviewing the record, we further conclude that this issue does not warrant our consideration under the plain error doc-

trine of Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). See *People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d 1091, 1093.

## B

Defendant contends he was denied a fair trial also because the prosecutor made improper and prejudicial remarks during closing argument. A prosecutor has great latitude in presenting his or her closing argument. A reviewing court is reluctant to set aside a verdict based on remarks made during closing argument and does so only where the remarks are clearly prejudicial. In determining whether the remarks are prejudicial, a court must refer to the content of the language used, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 421, 355 N.E.2d 634, 645.) Also, the trial court is in a better position than a reviewing court to determine the prejudicial effect of a remark made during closing argument. Absent a clear abuse of discretion, its ruling should be upheld. *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327.

■ The record shows that after the defendant objected to each of the prosecutor's four allegedly improper remarks, the trial judge instructed the jury that closing arguments are not evidence and any argument made that is not based on the evidence should be disregarded. The trial judge also gave this admonition immediately prior to closing argument and included the admonition in his written instructions to the jury. We must presume that the jurors followed the trial judge's instructions. (See *People v. Jackson* (1986), 145 Ill. App. 3d 626, 642, 495 N.E.2d 1207, 1220.) Thus, these errors, if any, were cured. (*People v. El* (1980), 83 Ill. App. 3d 31, 41, 403 N.E.2d 547, 555.) After reviewing the record, we hold that none of the prosecutor's remarks, considered individually or cumulatively, denied defendant a fair trial.

## III

Defendant lastly claims that the trial judge exceeded his discretion in sentencing him. Defendant argues that "the trial judge improperly considered the death of the victim as an aggravating factor." Defendant argues, therefore, that the trial judge exceeded his discretion, and that this requires us to vacate his sentence.

A sentencing decision is a matter of judicial discretion and, so long as the sentence is within the statutory limits, we hesitate to exercise our power to reduce it absent a finding that the trial court exceeded its discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153,

368 N.E.2d 882, 883.) Following a murder conviction, it is improper for a sentencing court to consider the victim's death as an aggravating factor because death is implicit in the offense and the legislature took death into account when it established the sentencing range for the crime. However, it is settled that a trial judge's observation that a defendant murdered someone, or the judge's acknowledgement that the victim died, does not establish that the judge improperly considered death as an aggravating factor. *People v. Verser* (1990), 200 Ill. App. 3d 613, 620, 558 N.E.2d 226, 231 (and cases cited therein).

■■ After closely reviewing the record, we cannot say that the trial judge exceeded his discretion. Defendant's 50-year sentence was within the statutory range. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(a).) It is true that the trial judge noted the fact that defendant killed the victim. However, the record also shows that the trial judge considered many different factors before imposing sentence. Our observation in *People v. Barney* (1982), 111 Ill. App. 3d 669, 444 N.E.2d 518, applies here:

> "Defendant assumes that the trial judge imposed a longer sentence than he otherwise would have because his statement referred to [the victim's] death. We think this assumption is unwarranted, since other factors that reasonably could be considered aggravating factors also were specified ***.
>
> *** It is unrealistic to suggest that the judge sentencing a convicted murderer must avoid mentioning the fact that someone has died or risk committing reversible error." (111 Ill. App. 3d at 679, 444 N.E.2d at 525.)

We hold that defendant's 50-year prison sentence was well within the discretion of the trial court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.