SECOND DIVISION 

APRIL 24, 2001

No. 1-99-1560 

THE PEOPLE OF THE STATE OF ILLINOIS,  ) Appeal from the

  ) Circuit Court of 

Plaintiff-Appellee,  ) Cook County 

  )

v.  ) 97 CR 21053

  ) 

SAM ARMSTEAD,  ) The Honorable

         ) Thomas R. Sumner,

Defendant-Appellant.  ) Judge Presiding.

     

JUSTICE COUSINS delivered the opinion of the court:

Defendant-appellant, Sam Armstead, was convicted of aggravated battery with a firearm and was sentenced to 12 years' imprisonment.  Defendant presents the following issues upon appeal:  (1) the State failed to prove him guilty of aggravated battery with a firearm beyond a reasonable doubt; (2) the trial court improperly admitted hearsay testimony; (3) the prosecutor, during cross-examination of defendant, asked questions that depicted to the jury that defendant was of bad moral character, denying him of a fair trial; and (4) during closing argument, the prosecutor
 improperly argued that the complainant and a nontestifying witness were afraid to testify that defendant was the offender, attempted to shift the burden to the defense, and repeatedly misstated the evidence, denying him of a fair trial.

We reverse and remand.

BACKGROUND

At defendant's jury trial, James Morris was called by the State.  Morris testified that on July 14, 1997, he "noticed somebody downstairs fighting" and he "went down to break the fight up."  There was a light pole about three feet away, which was dimly lit.  Morris discovered that it was his cousin, Rochelle Appling, fighting with defendant's cousin, Yolanda Armstead.  Morris stated that two of defendant's nephews, Latrell and Jen, were also there.  As he broke up the fight between the two women, Morris was involved in "a little tussle" with defendant's two nephews.  At that time, he did not see a weapon. 

After the fight between the two women was broken up, Morris went upstairs with his mother.  Approximately 5 to 10 minutes later, Morris went back outside.  While outside, Morris spoke to his friend Vernon Martin for about five minutes on the sidewalk.  About five feet away from them was a crowd of 5 to 10 people.  Morris testified that he heard someone say "Don't mess with my cousin."  As Morris turned toward the voice, he noticed someone shooting at him.   He initially testified that he did not see the shooter or the gun.  He then testified that he could see the gun and as he tried to grab the gun, he fell and the shooter fell on top of him.  The shooter quickly got up and ran away.  He testified that he did not see the shooter's face.  

Morris further testified that on July 15, 1997, the day after the shooting, police officers came to speak with him at the hospital.  A female detective showed Morris a picture of defendant.  Morris testified that she asked, "Is this the one that shot you?" and he told her, "This is the one I heard shot me."

On July 22, 1997, two or three officers visited Morris at the hospital to tell him that they caught defendant and asked Morris to identify defendant from five pictures.  Morris testified that he told the officers that he heard that the defendant shot him.  When the State asked, "Isn't it true that you told them that, 'Sam was the one that shot me'?  Isn't that what you told the detectives at the hospital?", Morris replied, "I don't remember." 

On cross-examination, Morris testified that on the day after he was shot, his mother came to the hospital and told him that while she was on the porch of their sixth floor apartment, she saw the defendant shoot him.  He stated that he saw the gun but did not see the face of the shooter.  The following questioning occurred during cross-examination:

   "MS. CAROTHERS [defense attorney]: And now, when you were in the hospital on the 15th when you talked to the woman detective, did she also show you a photograph?

   A. Yes.

* * *

   Q. And did you tell the detective that this was Sam Armstead? ***

   A. Yes. 

* * *

   Q. Okay. Now, why did you tell her that was the person that shot you?

   A. Because that's who I thought shot me, and that's who I heard shot me."

   During redirect examination, the following colloquy occurred:

   "MR. FAHLGREN [assistant State's Attorney]: Now, do you recall myself, my partner and your mother Minnie Morris coming into the cell to speak to you?

   A. Yes.

* * *

   Q. And didn't you answer in response to that question that it was Sam Armstead that shot you?

   A. Yes.

   Q. Weren't you -- were you asked the question, 'The night you were shot, did you see the shooter'?

   A. Yes.

   Q. And you said yes, correct?

   A. Correct.

   Q. And you said you recognized him, correct?

   A. Correct.

   Q. And yesterday during that conversation didn't you tell myself and my partner and your, in your mother's presence that the night of the shooting you did see Sam Armstead shoot you?  Is that correct?

   A. Yes."

Upon re-cross-examination, the defense attorney inquired:

   "MS. CAROTHERS [defense attorney]: And you knew that your mom had said that she saw the shooting from the balcony on the sixth floor of the project, right?

   A. Right.

   Q. And you said that because you didn't want to make your mother out a liar, did you?  You didn't want to do that to your mom, did you?

   A. Uh uh."

The State also called Minnie Morris, James Morris' mother.  She testified that on the evening of July 13, 1997, she was on her balcony with two friends.  From there she noticed her niece, Rochelle Appling, fighting with Yolanda Armstead.  She observed her son, James, attempt to stop the fight and saw two young men start fighting him.  Mrs. Morris then went downstairs and told James to go upstairs, but he did not go at that time.  While downstairs, Mrs. Morris saw a young woman pick up a piece of glass and try to cut Rochelle.  Yolanda was cut instead.  She testified, "Then Latrell had pulled a gun out, and a boy grabbed him, and next thing I know, he was gone.  And I looked around and I told James to come upstairs.  I made him come upstairs where I was." 

Mrs. Morris stated that about 10 minutes later, Vernon Martin asked James to come back downstairs.  She watched James go downstairs and talk with some people for a short while.  She saw James walk over to an adjacent building with Vernon Martin.  Shortly thereafter, she heard a car approach and saw Latrell get out of the car and he pointed toward her son and Vernon Martin.  She testified that she also saw the defendant walking toward James and Vernon.  The pertinent testimony regarding the shooting included the following:

   "A. I don't know if he said anything to him or anything.  Only thing I can see was firing coming out the gun.  He was shooting, shooting, shooting, shooting.

   Q. Who was?

   A. Sam Armstead.

   Q. Who was he shooting?

   A. He was shooting my son James Morris.

* * *

   I seen Sam come down, going down 14th Street coming from over there with the gun in his hand."

During cross-examination, the following colloquy occurred between defense counsel and Mrs. Morris:

   "MS. HILL-MCCLAIN [defense attorney]: And at some point, your son, according to you, got up off the ground, correct, again?

   A. He was trying to run.

   Q. Okay.  So he got up and turned his back toward Mr. Armstead, is that what you are saying?

   A. Sure did.

   Q. When turned his back, at the time Mr. Armstead shot him again, four more times?

   A. Sure did.

   Q. Once in the stomach, correct?

   A. No, he shot him once in the stomach when he first started.  When he first started." 

Mrs. Morris also gave the following testimony:

"Q. Did you then return after not being able to see James [at the hospital]?  Did you return to the scene?

A. Yes, with an officer.

Q. Did you see police officers there?

A. Yes.

Q. Did you talk to the police officers?

A. Yes.

Q. And did you tell the police officers immediately after the shooting who shot your son?

A. Sam Armstead."

Mrs. Morris further testified that she had known defendant for about 15 years.  She stated that on July 22, 1997, she viewed a lineup and identified Sam Armstead as the shooter. 

The testimony of Officer Patrick O'Kelly establishes that, at approximately 12:25 a.m. on July 14, 1997, Officer O'Kelly and his partner were dispatched to a call of a man shot at 2650 West Ogden.  They went to the scene and observed Morris shot and bleeding.  An ambulance arrived and took Morris to Mount Sinai Hospital.
  During direct examination, the State asked Officer O'Kelly this leading question:  "Okay.  Did you later speak to Minnie Morris?"  The response was, "Yes."  The State then continued examining O'Kelly as follows: 

   "Q. [Assistant State's Attorney:] Where did you speak to her?

   A. In the emergency room of Mount Sinai.

   Q. When you spoke to her, did you learn the identity of the shooter?

   A. Yes.

   Q. Who did you learn the shooter was?

   MS. CAROTHERS [defense attorney]: Objection.

   THE COURT: Form of the question.  Sustained.

   Q. When you spoke to Renina Morris did you learn from her what happened?

   A. Yes.

   Q. What did you ascertain the identity of the perpetrators involved in this offense?

   A. Yes.

   Q. What did you ascertain?

   MS. CAROTHERS: Objection.

   THE COURT: Sustained.  It's the same question, Counsel.

   MS. SCARIA: After speaking to her, did you ascertain the identity, without naming, without saying what she said, did you ascertain the identity of a shooter?

   A. Yes.

   Q. Did you fill out a case report in this matter?

   A. Yes. 

   Q. And was the offender named in this case report?

   A. Yes. 

* * *

   Q. After you spoke to Renina Morris, what name did you have that you put in your report?

   MS. CAROTHERS: Objection.

   MS. SCARIA: Judge, it's prior identification.

   THE COURT: Objection sustained.

   MS. SCARIA: Judge-- 

   THE COURT: Counsel, sustained.

   MS. SCARIA: After you spoke to Renina Morris, did you have someone you were looking for?

   THE WITNESS: Yes.

   Q. Who was that?

   A. Sam Armstead."

Officer O'Kelly further testified that Renina was the only person that he recalled speaking to and getting a statement.  He did not recall speaking to James Morris' mother or the mother of James Morris' children.  O'Kelly was not involved in any further investigation of the shooting.

The State called Detective Patricia Sawczenko to testify.  She testified that shortly after 5 p.m. on July 15, 1997, she brought a black and white picture of Sam Armstead to the hospital and showed it to James Morris.  She testified that when she showed James the photograph, Morris stated that the person in the photograph was the person that shot him.  During cross-examination, Sawczenko stated that she did not see Minnie Morris' name listed as a witness in the police report prepared by O'Kelly.  Sawczenko stated that she spoke with James' mother on the phone because she was trying to reach Renina, but she did not prepare any reports regarding a conversation with Minnie Morris.  Sawczenko never spoke with Renina.  Sawczenko also testified that in her report regarding her interview of James Morris, there was no mention of James wrestling with the shooter.  She also stated that James Morris did not indicate to her that he had merely heard that it was defendant that had shot him.

Officer Gayle Maurovich was called by the State and testified that on July 22, 1997, she discovered that defendant was in custody and conducted a lineup.  Mrs. Morris identified defendant from the lineup as the one whom she saw shoot James Morris.  After the identification, Maurovich arranged for photographs to be taken of the lineup and took those five photographs to James Morris at the hospital.  Two other detectives and an assistant State's Attorney accompanied Maurovich to the interview.  She testified that after showing Morris the photo array, he identified defendant as the person he saw shoot him.  During cross-examination, Maurovich testified that she did not indicate to Morris that his mother had viewed a lineup or that she had identified defendant as the shooter.  She stated that James did not indicate to her that he tried to grab the gun from the shooter.  She also stated that during the interview, James indicated to her that when defendant and Latrell walked up to him on the night of the shooting, James started to search Latrell for a gun and that is when defendant shot him.

The State proceeded by stipulation with Dr. Steven Wise's report of James' emergency room examination at Mount Sinai Hospital.  It was stipulated that James suffered one gunshot to his abdomen, four gunshot wounds to his left leg, and three gunshot wounds to his right leg.  All of the entrance wounds were in the front of his body.  Toxicology reports showed that he had cannabanoids and ethyl alcohol in his system.  Upon entering certain exhibits into evidence, the State rested its case in chief.

The defendant made a motion for a directed finding.  The motion was denied. 

Sharonda Lee was then called
 to testify.  Lee stated that on July 14, 1997, from approximately 8 p.m. to 2:30 a.m., she was with defendant at Douglas Park at a birthday party.  During cross-examination, Lee admitted that while she did not have a romantic relationship with defendant, she had a "crush" on him.  She stated that she saw defendant two or three times a week from May to July of 1997 for several hours at a time.  Lee stated that, in February of 1998, defendant told her that he was arrested for allegedly shooting someone.  Shortly before the trial, defendant asked Lee to testify at trial as to the events of July 13 to July 14, 1997.

Next, Yolanda Armstead, defendant's cousin, was called to testify.  She testified that during a fight on July 13, 1997, at approximately 11 p.m., Rochelle Appling cut her face with a broken bottle.  During cross-examination, Yolanda stated that she saw her cousin Latrell Armstead outside, but she denied seeing him fight with James Morris.  

The defendant then testified on his own behalf.  When asked whether he shot James Morris with a gun on July 13 going into the morning of July 14, 1997, he testified that he did not.  During cross-examination, defendant testified that he did not have a fight or argument with James Morris on the night in question.  He testified that he attended a birthday party for a "friend of a friend" on July 13, 1997, and did not learn of the fight between Rochelle and Yolanda until July 14, 1997.  He also stated that he was not aware that James Morris had interfered during the fight. 

ANALYSIS

I

The defendant in the instant case was found guilty of aggravated battery with a firearm pursuant to the Criminal Code of 1961 (720 ILCS 5/12-4.2(1) (West 1996)).  A person commits aggravated battery with a firearm when he or she, in committing a battery, knowingly or intentionally by means of the discharging of a firearm causes any injury to another person.  (720 ILCS 5/12-4.2(1)) (West 1996).  The prosecution has the burden of proving beyond a reasonable doubt all the material and essential facts constituting a crime committed by an accused.  
People v. Lopez
, 152 Ill. App. 3d 667, 677, 504 N.E.2d 862 (1987).  Defendant in the instant case contends that his conviction should be reversed because the State failed to prove him guilty beyond a reasonable doubt.  Specifically, he argues that:  (1) James Morris was unable to identify him as the offender, and (2) the identification by Minnie Morris was doubtful, was contradicted by the evidence, and was not brought forward until eight days after the offense.  

A criminal conviction will not be set aside unless the evidence is so improbable and unsatisfactory that it creates a reasonable doubt of the defendant's guilt.  
People v. Hood
, 229 Ill. App. 3d 202, 210, 593 N.E.2d 805 (1992).  It is the reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the court and the jury saw and heard the witnesses.  
Hood
, 229 Ill. App. 3d at 210.  If, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction will not be overturned.  
People v. Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).  At trial, Morris testified that he did not see the face of the shooter.  However, two police officers testified that during their investigation James Morris identified the defendant as the shooter. 

Defendant also contends that the only witness who identified him as the offender was Minnie Morris and that her identification is doubtful, contradictory, and incredible.  Defendant relies on Minnie's distance from the actual shooting, the dim outdoor lighting, the amount of time she had to observe the offender, the fact that there was a large crowd of people in the area, and the fact that she covered her face and fell from her chair when the shooting started.  Defendant also points out Minnie's testimony as to her son being shot as he ran away conflicted with the medical report stating that he suffered only frontal wounds.  

However, where the evidence is conflicting
, it is the duty of the trier of fact to resolve any conflicts and determine questions of credibility and weight.  
People v. Mullen
, 141 Ill. 2d 394, 403, 566 N.E.2d 222 (1990).  
A positive identification by one witness with ample opportunity to observe is enough to prove a defendant guilty beyond a reasonable doubt.  
People v. Escobar
, 77 Ill. App. 3d 169, 175, 395 N.E.2d 1028 (1979).  The test of positive identification is whether the witness is close enough to the accused for a sufficient length of time under the conditions adequate for observation, and where this test is met, the credible testimony of one witness is sufficient to support a finding of guilt.  
People v. Crawford
, 90 Ill. App. 3d 888, 891, 414 N.E.2d 25 (1980).  Despite the inconsistencies of Minnie Morris' testimony, we cannot say that no rational jury could have found defendant guilty of aggravated battery with a firearm beyond a reasonable doubt.  See 
People v. Sanchez
, 115 Ill. 2d 238, 260-61, 503 N.E.2d 277 (1986).

II

Defendant next asserts that the testimony of Officer O'Kelly was hearsay and constituted reversible error.  Hearsay is defined as testimony of an out-of-court statement offered to establish the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court asserter.  
People v. Lopez
, 152 Ill. App. 3d 667, 672, 504 N.E.2d 862 (1987).  The basis for excluding evidence under the hearsay rule lies in the fact that an opportunity to ascertain the veracity of the testimony is absent.  
People v. Rogers
, 81 Ill. 2d 571, 577, 411 N.E.2d 223 (1980).  An opportunity for cross-examination of the party whose assertions are offered to prove the truth of the matter asserted is an essential requirement of such a testimonial offering and, accordingly, testimony by a third party as to statements made by another nontestifying party identifying an accused as the perpetrator of a crime constitutes hearsay testimony and is inadmissible.  
Lopez
, 152 Ill. App. 3d at 672, citing 
Rogers
, 81 Ill. 2d at 577-79.

The State argues that because defendant only raised objections during the preliminary questions in the sequence of questions at issue, but did not object to the final question nor was a challenge raised in defendant's post-trial motion, this argument is waived.

Generally, alleged errors must be objected to at trial and specified in a posttrial motion in order to preserve them for appeal.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).  The Illinois Supreme Court has held that the failure to raise a contemporaneous objection to each in a series of statements waives appellate review of the unobjected-to statements, even where prior objections to similar statements were overruled.  
People v. Steidl
, 142 Il. 2d 204, 233, 568 N.E.2d 1033 (1991).  Although lack of a timely objection waives such a challenge for review, the rule of waiver is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result.  
Lopez
, 152 Ill. App. 3d at 676.  

An exception to the waiver rule exists under the plain error doctrine.  Under the plain error doctrine, issues regarding the violation of constitutional rights not properly preserved for review may still be reviewed under two circumstances:  (1) where the evidence is closely balanced, or (2) where the error is of such a magnitude that the commission thereof denied the defendant a fair trial.  See 134 Ill. 2d R. 615(a).  In the instant case, the evidence is closely balanced and the plain error doctrine is applicable. 

During Officer O'Kelly's testimony, it was elicited that he was told by Renina Morris that defendant was the shooter.  The State argues that this is not inadmissable hearsay, but a statement used to explain the progress of the police investigation.  It is true that a statement used to detail the course of a police investigation, not to prove the truth of the matter asserted, is not hearsay.  
People v. Malave
, 230 Ill. App. 3d 556, 560, 595 N.E.2d 117 (1992).  Such a statement is admissible if offered for the limited purpose of explaining why the police conducted their investigation as they did or why they arrested defendant.  
Malave
, 230 Ill. App. 3d at 561.  Where the trial court admits out-of-court statements for the limited purpose of explaining why the police acted as they did in their investigation, the court must specifically instruct the jury that the statement is introduced for a limited purpose and that the jury is not to accept the statement for the truth of its contents.  
People v. Williams
, 233 Ill. App. 3d 1005, 1017, 599 N.E.2d 1033 (1992).

Admission of hearsay identification testimony constitutes plain error only where it serves as a substitute for courtroom identification or is used to strengthen and corroborate a weak identification.  
People v. Hughes
, 259 Ill. App. 3d 172, 178-79, 632 N.E.2d 251 (1994).  If the hearsay testimony is merely cumulative, or is supported by a positive identification and other corroborative circumstances, it constitutes harmless error.  
People v. Smith
, 59 Ill. App. 3d 480, 490, 375 N.E.2d 941 (1978).  But before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.  
Chapman v. California
, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828 (1967).  

The final series of questions during O'Kelly's direct examination was part of a long series of objected-to and unobjected-to questions.  The questioning clearly revealed the substance of the conversation between Renina Morris, a nontestifying witness, and Officer O'Kelly and implicated defendant as the shooter.  Because the evidence in the instant case is close, the testimony could have affected the outcome of the case.  We hold that this testimony as to statements made by a nontestifying party identifying the defendant as the shooter is inadmissable hearsay and eliciting this testimony constitutes reversible error.

Additionally, defendant contends that his trial counsel's failure to preserve this issue for appeal by including it in the posttrial motion was ineffective assistance of counsel.  Because we reverse and remand this case for a new trial on other issues, we do not reach this issue.

III

The defendant, citing 
People v. Butler
, 58 Ill. 2d 45, 317 N.E.2d 35 (1974),
 next contends that continued attempts to impeach him with evidence depicting bad character was improper and denied him of a fair trial.  Defense counsel objected to the State's cross-examination about his cohabitation with his long-time girlfriend prior to his arrest and marriage to a different woman shortly after his arrest.  This issue was raised in the posttrial motion and  has been properly preserved for review.

It is well established that the scope and propriety of cross-examination rest largely in the discretion of the trial court, and the court's decision will be overturned only where an abuse of that discretion results in manifest prejudice to the defendant.  
People v. Gacho
, 122 Ill. 2d 221, 245-46, 522 N.E.2d 1146 (1988).  
In 
Butler
, as in the instant case, irrelevant cross-examination was used to establish the defendant's bad character.  
Butler
, 58 Ill. 2d at 49-50.  The defendant in 
Butler
 was questioned extensively regarding the details of his trip to New Orleans with a woman and his living arrangements both prior and subsequent to that trip. 
 
Butler
, 58 Ill. 2d at
 
50.  That questioning, which was objected to by defendant but permitted by the court, revealed that, prior to and after the trip, the defendant had lived with two different women, neither being the woman who accompanied him to New Orleans.  
Butler
, 58 Ill. 2d at 50.  The Illinois Supreme Court stated that the only purpose of such questioning was to demonstrate to the jury that the defendant "was of bad moral character."  
Butler
, 58 Ill. 2d at 50.  The court held that the questioning was clearly improper and defendant's objections should have been sustained in that case.  However, the court in 
Butler
 did not consider the evidence to be close and held the error to be harmless.  
Butler
, 58 Ill. 2d at 50.  A death sentence in that case was vacated for other reasons.  
Butler
, 58 Ill. 2d at 50.

Another instructive case is 
People v. Nuccio
, 43 Ill. 2d 375, 253 N.E.2d 353 (1969).  In 
Nuccio
, the State repeatedly insinuated that defendant and his witnesses had engaged in a pattern of reprehensible conduct in their relationships with youths that frequented a restaurant.
 
 
Nuccio
, 43 Ill. 2d at 381.  It was the court's view that the totality of the impact of the State's unsupported insinuations denied defendant the right to a fair trial.
  
Nuccio
, 43 Ill. 2d at 381.
 

In the instant case, the judge, on cross-examination, gave the State wide latitude to demonstrate that the line of questioning had some relevancy.  However, the judge ultimately halted the questioning and stated that it had no bearing on defendant's credibility.
 
 The questioning in the instant case is similar to the questioning in 
Butler
 and 
Nuccio
.  The evidence is close and the State's case is weak.  Therefore, we cannot say that the improper cross-examination of defendant depicting bad character was harmless beyond a reasonable doubt.  Fundamental fairness mandates a new trial.  
See 
Nuccio
, 43 Ill. 2d at 396.

IV

Defendant further contends that the State committed reversible error during the State's closing argument by improperly indicating that James Morris was afraid to identify defendant as the shooter, by arguing that certain persons who were allegedly witnesses were not called by the defense to testify, and by repeatedly misstating the evidence.  The defendant claims that these errors denied him a fair trial.

Specifically, the State stated during closing argument that James Morris "had to have seen the face of the shooter. *** You know that -- you know where the defendant lives. *** And you know where the victim lives.  Think about it ladies and gentleman."  Objections were made by defendant and a challenge was raised in defendant's posttrial motion.  Therefore, this issue has been properly preserved for review.

While the prosecutor is allowed a great deal of latitude in making his opening and closing statements (
People v. Pasch
, 152 Ill. 2d 133, 184, 604 N.E.2d 294 (1992)), assumptions and statements of fact not based upon evidence may not be argued to the jury (
People v. Beier
, 29 Ill. 2d 511, 517, 194 N.E.2d 280 (1963)).  Prosecutorial statements that suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon the record, are highly prejudicial and inflammatory.  
People v. Mullen
, 141 Ill. 2d 394, 406, 566 N.E.2d 222 (1990).  

The trial court's determination of the propriety of the remarks made will not be disturbed absent a clear abuse of discretion.  
Pasch
, 152 Ill. 2d at 185.  In evaluating claims that remarks in closing arguments were erroneous, reviewing courts must consider these remarks in the context of the parties' arguments as a whole.  
People v. Buss
, 187 Ill. 2d 144, 244, 718 N.E.2d 1 (1999).  To constitute reversible error, the complained-of remarks must have resulted in substantial prejudice to the accused, such that, absent those remarks, the verdict would have been different.  
People v. Cisewski
, 118 Ill. 2d 163, 175, 514 N.E.2d 970 (1987).  While a prosecutor's statement based on a legitimate inference from the evidence does not constitute improper argument (
People v. Albanese
, 104 Ill. 2d 504, 520, 473 N.E.2d 1246 (1984)), the indication by the State that Morris felt threatened by defendant or his family was not based on any evidence.  Due to the closeness of the evidence in this case, this error, together with other errors, constituted reversible error. 

During the defendant's closing argument, defense counsel also stated that Renina Morris did not testify "because she would have told you Sam Armstead did not do this shooting."  During rebuttal argument, the State asked the jury to consider that James Morris' sister, Renina, was not present to testify because defendant's large family lived in the same building as Renina's family.  In the State's appellate brief, the State argues that the defendant invited the prosecutor's comments about Renina Morris.  We disagree.

However, defendant made no objection to these comments either
 during trial or in the posttrial motion.  This issue has not been preserved for review.  Additionally, we do not consider the plain error doctrine applicable.

Defendant next contends that the State improperly shifted the burden of proof to him by commenting on defendant's failure to call certain witnesses.  During rebuttal argument, the State stated:

   "Counsel did allude to Linda Jamison, Coretha Maclin (phonetic)-- not Matthews, Maclin, and said that, well, they were sitting out there during the shooting.  Why aren't they brought in?  

   Well, what she didn't tell you, ladies and gentlemen, is that the defense has the same subpoena power as the [S]tate does."

Defendant objected and the court overruled that objection.  The State continued:

   "And if they thought for one minute they would have identified anybody else but Sam Armstead as the shooter, they had the opportunity to find those people, and you heard no evidence that that happened."

No further objection was made and this issue was not raised in defendant's posttrial motion.  However, due to the closeness of the evidence, together with other errors, this issue is reviewable under the plain error doctrine.  

The burden of proof never shifts to the accused, but remains the responsibility of the prosecution throughout the trial.  
People v. Weinstein
, 35 Ill. 2d 467, 470, 220 N.E.2d 432 (1966).  In fact, it is reversible error for the prosecution to attempt to shift the burden of proof to the defense.  
People v. Falconer
, 282 Ill. App. 3d 785, 791, 668 N.E.2d 1095 (1996).  Moreover, a defendant is not bound to produce any witnesses and it is error to comment on his failure to do so.  
People v. Swift
, 319 Ill. 359, 365-66, 150 N.E.2d 263 (1925).  However, where the defendant is responsible for injecting a witness into the case or refers to his efforts to secure the witness, it is proper to comment on defendant's failure to produce that witness.  
People v. Scaggs
, 111 Ill. App. 3d 633, 636 (1982).  

In the instant case, Minnie Morris, the State's witness, testified that two other women were with her on the night of the shooting.  She did not provide these names during the defendant's case in chief.  The State elicited these names on direct examination of Mrs. Morris. 

The State also stated during its rebuttal:

   "Let's talk for a moment about the alibi.  Sam Armstead, convicted felon, told you he's with all these people at a party, and they're not just generic people.  He gives names.  Charles Clark, Pooh, Little D, Anthony, and of course Shawanda, who had the crush on him.

* * *

   Those people were with him. *** He did, however, choose to call witnesses.  He did, however, choose to take the stand himself, and he told you about all these people that he was with.  But we didn't hear from anybody else about where he was that night."

No objection was made as to these statements and it was not raised in the posttrial motion.  Here, in light of the closeness of the evidence, together with other errors, we review this error under the plain error doctrine.

A complete review of the record indicates that the defendant did not reveal the names of other party-goers until he was cross-examined by the State.  The defendant has no burden to produce these witnesses to support an affirmative alibi defense.  
Swift
, 319 Ill. at 365-66.  The State's argument was improper and erroneous.  The evidence in this case is close.  So, due to this error, together with other errors, we cannot say that the error was harmless beyond a reasonable doubt.

Defendant next contends that the State, during its closing argument, misstated the evidence, thereby denying him a fair trial.  In the first instance, the State argued:  "There is no evidence that [James Morris] turned his back to run to get away."  Defense counsel objected to the statement based upon Minnie Morris' testimony.  The judge admonished the jury to rely on its own recollection of the facts.  In the second instance, the State argued:  "There is not one letter or word of evidence in this case to show anybody out there but the defendant had a gun, and I'd ask you consider that, ladies and gentlemen."  This statement, again, conflicts with Minnie Morris' testimony at trial.  However, there was no objection made at trial as to this comment and it was not specifically raised in defendant's posttrial motion.  Therefore, the issue is waived for review.  However, were this issue not waived, we do not agree that reversible error occurred.  Reversible error only occurs where the remarks are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant.  
People v. Smith
, 141 Ill. 2d 40, 64, 565 N.E.2d 900 (1990).  The record does not establish that these remarks are attributable to deliberate misconduct of the prosecutor. 

Accordingly, for the foregoing reasons, we reverse defendant's conviction for aggravated battery with a firearm and remand for a new trial.

Reversed and remanded.

GORDON and McBRIDE, JJ., concur.