THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDDIE BROWN, Defendant-Appellant.

First District (6th Division)   No. 1—90—3260

Opinion filed March 19, 1993.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Matthew L. Moodhe, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Eddie Brown, was convicted after a bench trial of first degree murder, attempted armed robbery, armed violence and unlawful use of a firearm by a felon and sentenced to concurrent terms of 42 years for first degree murder, 15 years for attempted armed robbery and 5 years for unlawful use of a firearm by a felon. He maintains that trial errors entitle him to a new trial. He does not dispute the sufficiency of the evidence.

On June 28, 1988, at approximately 6:20 p.m., Cornelius Simmons was fatally shot in his barbershop located at 839 East 47th Street in Chicago. At the time of the shooting several people were nearby. The police questioned those people, including Arnell Givens, Irma Crump and Eula Tate; the police also held at least two lineups and several photograph identification sessions. The defendant's photograph was identified by Eula Tate as one of the persons involved in the shooting. The defendant was arrested and subsequently indicted. After a hearing, the trial judge denied the defendant's motion to suppress identification testimony.

At trial the deceased's daughter, Demetrius Baskin, testified that she visited her father in his barbershop approximately three times in

1988. Before the shooting, she had not seen her father in the barbershop for approximately three months. Her father kept coins and paper money in the pockets of his smock while he worked because he sometimes gave this money to his grandchildren. When customers paid her father, he put the money into the cash register, not into his pockets.

Officer Robert Edwards testified that he went to the barbershop shortly after Simmons was shot. The description of the two offenders he put in his report came from Lashawn Hunter, who actually did not see the offenders. The report described one man as taller than the other. The shorter offender, later identified as the defendant, was described as standing 5 feet 7 inches tall, weighing 120 to 130 pounds, having brown hair and eyes and a dark complexion, and wearing a baseball cap and dark blue jacket. The taller offender, later identified as Michael Phillips, was described as having a light complexion.

Irma Crump testified that she was near the barbershop at the time of the shooting visiting a friend, Arnell Givens, who lived a short distance from the barbershop. Crump was standing on the balcony of Givens' apartment, which is on the third floor. She could "see 47th Street very plain between Drexel and Cottage Grove." She saw Givens drive her car around the building and eventually park in front of the apartment on 47th Street. When Givens came to the apartment, they both went to the balcony. Crump saw two men "just kind of hanging around downstairs" on the same side of 47th Street on which her car was parked. She described these men as follows: one had dark skin, was about 5 feet 6 inches or 5 feet 7 inches tall, and wore jogging pants, a navy or black jacket, and a cap; the other was tall and light-skinned, and wore a jogging suit and a cap.

Crump saw the shorter man go into the barbershop side of the building; she was not sure what store he entered. About a minute and a half later the shorter man came running out of the building, crossed Drexel Avenue with his hand in his jacket, and started to take off his jacket. At this time, the taller man, who was outside the building, "stood there like he was confused, and then *** took off across Drexel." She never saw the shorter man's face, perhaps because of his cap visor or the height of the balcony. She was unable to make a photograph identification and never viewed a lineup.

Arnell Givens testified that she drove into an alley leading to the parking lot behind the building in which she lived. She saw two men standing in front of the building. She described one man as "tall and fair complected" and the other as "dark complected, a gentleman, short." She identified the defendant in court as the shorter man.

Givens explained that she became nervous when she saw the men in front of the building because of "the vibes that [she] picked up, and the way they were—the way that they were just standing there." She parked her car on 47th Street facing east. Before leaving the car, she sat and watched the men for a few moments. While she was watching, the men were to the side of her. She explained that she waited before leaving the car because she "didn't like the way [the defendant] looked." He "just had a real devastating look on his face." She did not know "whether he wanted to rob [her], or what he was going to do." She walked past the men on her way into her apartment building entrance. Once inside, she turned and leaned out the door to see them, and the taller man walked close beside her and said, "Hi," while waving his hand. This startled her, and she slammed the door and went up to her apartment.

She went onto the balcony with her children and Irma Crump. She felt compelled to look out from the balcony because she thought the men might be trying to steal Crump's "really nice" car. When Givens returned to the balcony, she saw the taller man standing on the corner, but she did not see the defendant. She next saw the defendant run out of the barbershop entrance, into traffic on 47th Street and onto Drexel Boulevard going north. At this time, the taller man turned around, saw the defendant running and began running himself.

On August 23, 1988, Givens went to the police station to view a lineup. She recognized the defendant and the taller man, Michael Phillips, in the lineup but told the detectives she could not identify anyone. The following direct examination occurred:

"[STATE'S ATTORNEY]: Why didn't you tell the detectives that, that you recognized them?
A. I was frightened.
Q. Frightened of whom?
A. I was scared.
Q. Who were you scared of?
A. Of just—what can I say, scared, scared."

Detective David Kutz called her and asked if she had been intimidated or contacted by anyone. She told him she had not been intimidated. She returned to the station that day and told Kutz that she had recognized someone but that she was nervous. Kutz asked her to look at a group of approximately six to eight photographs. She identified the defendant from these photos at the station and in court.

On cross-examination, Givens said she remembered the defense attorney and an investigator visiting her outside her apartment ap-

proximately two months before trial. She denied that she told the defendant's attorney that she was unsure of her identification. She explained that her only hesitation was based on the fact that two years had passed since the crime and that she told the defendant's attorney she would "definitely know the person when [she saw] him."

Eula Tate testified that she was working at the D & J Cleaners on the 800 block of East 47th Street. The cleaners is located on the first floor of the same building as the barbershop owned by Simmons. She saw two "boys" pass by the cleaners and cross 47th Street. She explained that she "could see out the window real good" and that she saw the two boys' faces. She saw "something brown" in the belt or near the waist of the shorter of the two. She saw the boys for "as long as they were standing there."

At approximately 5:40 p.m., she decided to close the cleaners for the day because she was frightened. She explained that three weeks earlier her store was "robbed" and that she was afraid when the two boys stood across the street and stared toward her. She turned off the regular lights, turned on the night lights, locked the gates, and left the cleaners. On August 26, 1988, Detectives Kutz and Romic came to her house and showed her photographs. She identified the defendant from the photographs, and she identified him in court.

Mark Funches testified that he was employed as a sales representative for Alarm Security. At the time he testified he had a pending criminal case for possession of a stolen motor vehicle. He formerly was a member of the Black Gangster Disciples gang. He knew the defendant through the Disciples gang; the defendant was also a Disciples member. At the time of the shooting, he had known the defendant for approximately six months, and had known Phillips for approximately two years.

Funches entered a Harold's Chicken Shack on 47th Street at about 3:30 p.m. on June 30 and saw the defendant and Phillips there. He walked over to the booth where they were sitting and heard the defendant and Phillips discussing "a sting they had committed." A "sting" is a robbery. Phillips told him they committed the robbery of the barbershop on 47th Street and Cottage Grove. The defendant told Funches that he had obtained the gun, entered the barbershop, "robbed the man's pockets," and left the barbershop. The defendant told him that Phillips was the "lookout man" and that only the defendant himself entered the barbershop. When Funches asked them who shot Simmons, "[t]hey just looked at each other and started laughing." The next evening Funches saw the defendant and Phillips at the same Chicken Shack and Phillips showed him a .32 caliber auto-

matic gun. Phillips then asked Funches if he wanted to be "a part of the sting."

On cross-examination, Funches admitted that he did not tell the police about the Chicken Shack conversations until approximately two months after they occurred. He could not remember exactly when he told the police about the conversations with the defendant and Phillips, but on redirect examination he testified that he told the police about those conversations on August 23, 1988. He did not go voluntarily to the police station to give the police that information. He was first at the police station for one of his own criminal cases because "that's where the court [at 51st and Wentworth] was." It was at that time that he told the police about the Chicken Shack conversations. The second time he went to the station was after the police picked him up and brought him to identify the defendant. He identified the defendant at that time.

Funches admitted that he was arrested twice between the dates of the conversations with the defendant and Phillips and the date he told the police about those conversations. One of the arrests was for the possession of a stolen motor vehicle, the charge that was pending at the time he testified. Funches also testified that he went to the police station at another time because he "was arrested for a warrant." (The testimony on this point is unclear, but the warrant may have been for a drug case that the State later dismissed.) Funches testified that the police did not make any promises to him in exchange for information about the Simmons killing.

Detective Robert McGuire testified that he observed Simmons' body. Three buttons were "apparently ripped right from the smock" Simmons was wearing. McGuire recovered $3 and change from Simmons' right front trouser pocket and from his back pocket a wallet containing identification only. There was no money in the smock pockets, but the cash register was closed and contained money.

By stipulation, it was established that Simmons was killed by two gunshot wounds to the abdomen and that the two bullets that killed Simmons came from the same .32 caliber gun.

■ The defendant first maintains that the judge improperly restricted his right to cross-examine Funches. During cross-examination of Funches the following occurred:

> "Q. You had a drug case dropped?
>
> A. Right. But the drug—let me explain it. The drug—
>
> THE COURT: Ask another question.
>
> Q. In fact you missed court and a bond forfeiture warrant was entered?

STATE'S ATTORNEY: Objection.

THE COURT: Sustained. Sustained as to some interim bond forfeiture. Sustained as to that question."

As previously noted, Funches testified on direct examination that he was a member of the Disciples Gang in 1988. During cross-examination the following occurred:

"Q. Mark, earlier you said you were a member of the Disciples Gang back in 1988, is that right?

A. Yes.

Q. What kind of activities did you do for the gang back then?

STATE'S ATTORNEY: Objection.

THE COURT: Sustained."

The defendant now contends that both rulings were reversible error. We disagree. A trial court has wide discretion to restrict the scope of cross-examination but must first allow sufficient cross-examination to satisfy the confrontation required under the sixth amendment as a matter of right. (*People v. Edwards* (1991), 218 Ill. App. 3d 184, 577 N.E.2d 1250.) To determine if the cross-examination allowed satisfied the constitutional requirement, a court "should look not to what a defendant had been prohibited from doing, but to what he had been allowed to do." (*Edwards*, 218 Ill. App. 3d at 194.) The focus in reviewing a claim of denial of the right of confrontation therefore should be on the sufficiency of the information available to the trier of fact when it made its credibility determination. (*People v. Shinkle* (1987), 160 Ill. App. 3d 1043, 513 N.E.2d 1072, *rev'd on other grounds* (1989), 128 Ill. 2d 480, 539 N.E.2d 1238.) In addition, a reviewing court should interfere with the trial court's decision involving the latitude of cross-examination only when the trial court clearly abused its discretion and manifest prejudice to the defendant resulted. *Edwards*, 218 Ill. App. 3d at 193; see also *People v. Phillips* (1989), 186 Ill. App. 3d 668, 542 N.E.2d 814.

The defendant was able to establish that Funches was a gang member at the time of the shooting. His testimony that the defendant and Phillips told him about a robbery in which they had participated, as well as his testimony that Phillips had asked him to participate in a robbery, leaves only the inference that he was more than a passive member of the gang. The defendant also established that Funches had a criminal charge pending against him at the time he testified and that he had had a drug charge dismissed by the State before he testified. The defense was able to show that Funches was familiar with guns and that he did miss a court date. Consequently, we believe that

the ruling denying him the right to show that a bond forfeiture occurred was of no consequence. In short, the defendant was able to establish that Funches was less than an ideal citizen and that he had an interest in testifying for the State.

The judge's ruling on a question about Funches' "activities" with the Disciples was not error. The term "activities" was vague and indefinite. The defendant's attorney made no attempt to show specifically what improper "activities" he wanted to show.

During cross-examination of Funches, the defendant's attorney attempted to impeach Funches with his grand jury testimony. On redirect examination Funches testified that the defendant tried to prevent Phillips from telling Funches about Simmons' murder. After the judge overruled the defendant's objection, Funches explained that Brown asked Phillips why he was revealing this information, and Phillips said, "Folks isn't going to say nothing." Funches explained that "folks" are fellow gang members. The prosecutor then asked Funches about an attack made on him by Disciples gang members the day after he told the police about the Chicken Shack conversation. Initially, the judge allowed the testimony, over defense objection, to refute "the inference at this point based on the cross-examination that he told the police about this to help himself."

Funches said that on August 24, 1998, he was approached by a Disciple's member who asked, "[W]hy do you trick on folks?" Funches tried to walk away but at least seventeen Disciples beat him up in an alley. He went to the hospital because of the beating. Directly after this testimony, the following occurred:

> "THE COURT: To make sure I am clear. This happened before you told the police about the conversation?
>
> FUNCHES: This happened the day after, the day after I talked with the police.
>
> THE COURT: Now, I don't understand the relevance.
>
> STATE'S ATTORNEY: Judge, on cross-examination it was brought up he had some ulterior motive, like a pending case.
>
> PUBLIC DEFENDER: He did.
>
> STATE'S ATTORNEY: That's the motive. He talked to the police about this, about this incident, that is the Harold's Chicken conversation with Phillips and Brown before this alley beating.
>
> FUNCHES: Excuse me—
>
> STATE'S ATTORNEY: But this does occur before the grand jury which on cross-examination counsel was trying to bring

out there was some ulterior motive for his grand jury testimony.

> THE COURT: I'll let it stand. It doesn't have the same direction or impact or weight that it would have had if it happened before he talked to the police."

The defendant now contends that the evidence that Funches had been beaten by others was prejudicial error. We agree that the evidence was improper. The evidence would have been proper if the State could have established that the defendant had encouraged or instigated the beating. Such evidence would be admissible as an expression of the defendant's consciousness of guilt.

The State has now abandoned the reason for the admissibility of the evidence advanced in the trial court: The defendant had "opened the door" by attempting to impeach Funches with his grand jury testimony. Now the State tells us that because the defendant attempted to show that Funches was not credible because of favorable treatment, the State "merely attempted to rehabilitate Mr. Funches by showing that the gang attack motivated him to testify truthfully regarding his knowledge of the victim's murder." The logic of the State's explanation is murky. We guess that the State is saying that Funches testified against the defendant because he was angry after the beating, not because of any favorable treatment he might receive in his own pending criminal case. In any event, regardless of the position of the State taken in the trial court and this court, it is clear to us, when we consider the State's closing argument, which will be discussed later, that the State was trying to create the inference that the beating had in fact taken place at the instigation of the defendant. The State now concedes that there was no evidence supporting that inference.

We do not believe, however, that the evidence constituted reversible error. It is also clear from the judge's remarks that he attached little, if any, significance to the evidence. He apparently believed that the evidence was admissible to show that the beating had angered the witness to the point that he decided to tell the police for the first time of his conversations with the defendant and Phillips. After the judge learned that the beating took place after Funches had talked to the police, he expressed his view doubting the relevance of the evidence. Moreover, we do not see how the evidence affected the judge's ultimate finding. Consequently, the evidence was not reversible error.

■ The defendant also alleges that error occurred during the closing argument of the State's Attorney. The following occurred:

"Arnell Givens should be believed, your Honor, even though she didn't make a positive identification of the first lineup. Use your common sense. Arnell Givens has to live there at 830 East 47th Street ***. She lived there.

***

Yes, Judge, when she told us she was too scared to make the identification she was too scared. This is somebody to be scared of.

We know this is true after Mark Funches gets involved in this case and he gets jumped by Eddie Brown's cohorts and they do a number on him because you are not supposed to trick on one of your folks.

PUBLIC DEFENDER: Objection.

THE COURT: This is rebuttal."

This argument was also improper. As we have already noted, there was no connection established between the defendant and the beating administered to Funches; and the argument was an attempt to show that there was a connection. Moreover, the beating took place after Givens had already told the police that she did not recognize anybody. (See *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222.) Again, however, we find that no reversible error occurred. This was a bench trial, and the trial judge is presumed to disregard incompetent matters presented to him. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.) It is inconceivable to us that an experienced trial judge would be inflamed by the State's closing argument to the point that his sound judgment was overcome. There is no likelihood that the result would have been different if the argument had not been made. See *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.

For these reasons, we conclude that no reversible error occurred and that the judgment of the circuit court should be affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.