THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL AUSTIN, Defendant-Appellant.

First District (5th Division)   No. 1—99—3224

Opinion filed March 15, 2002.

QUINN, J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Owen D. Kalt, and Ronald Dewald, Jr., Assistant State's Attorneys, of counsel), for the People.

JUSTICE REID delivered the opinion of the court:

Following a bench trial, Michael Austin was convicted of three counts of attempted first degree murder (720 ILCS 5/8—4, 9—1 (West 1992)), three counts of armed violence (720 ILCS 5/33A—2, 12—4(a) (West 1992)), and three counts of aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1992)). Austin was sentenced to three consecutive 30-year terms to be served consecutively with a 120-year sentence from a prior conviction in the case of *People v. Austin*, 1—99—1272 (December 11, 2001) (unpublished order under Supreme Court Rule 23). The trial court further sentenced Austin to three concurrent 30-year terms on the armed violence convictions. The trial court merged the aggravated battery convictions. His total aggregate sentence in both of these cases is 210 years.

## THE FACTS

Monique Holmes went alone to the Tasty Sub restaurant on the evening of November 30, 1995. She had intended to run errands but instead met up with friends. She left the restaurant to call a cab from a nearby pay phone, then returned to wait outside the restaurant for her food to be prepared. Though the sun had set and it was "kind of dark," there were streetlights illuminating the area. Holmes saw two gunmen standing behind a girl in french braids. The gunmen were in a vacant lot on the north side of Chicago Avenue. One of them was holding a silver gun. During November 1995, the north and south sides of the street had been used in an ongoing gang war which involved the exchange of gunfire. On the night in question, shots were fired at the restaurant window. Someone said, "get down, Monique, run." A bullet wounded her in the right side of the head, causing permanent paralysis from her waist down and partial paralysis in her left arm and the left side of her face. As a result of her injuries, Holmes is permanently confined to a wheelchair. Bryan Sullivan suffered a gunshot wound to the head which caused him to lose his right eye. Verlee Barron suffered two gunshot wounds, one to the left side of his head near his ear and the other to the back of his left shoulder.

Defendant Michael Austin and co-offender Melvin Chapman began shooting at the people outside of the restaurant, then ran westbound along the north side of Chicago Avenue. They fired several more times

as they ran. The police recovered four 12-gauge shotgun shell casings near the vacant lot and 13 9-millimeter casings at various locations on the north side of Chicago Avenue. A live 9-millimeter casing was also found. Holmes identified both Austin and Chapman. Barron also identified Michael Austin, although he knew him under a different gang nickname. The police approached Barron while he was hospitalized as a result of the shooting. Barron was afraid to tell them what happened because he feared reprisals if he talked. He was similarly afraid to speak several days later when the police came to his home to make a second attempt at getting a statement. Approximately six weeks after the shootings, Barron was asked to view a lineup, at which point he identified Austin as the person who shot him.

On the day of the shooting, Sullivan saw Austin and Chapman in the vacant lot wearing black coats and carrying firearms. Sullivan saw the guns and heard the gunshots before he received his injuries. Like Barron, Sullivan indicated he did not wish to cooperate with the police for fear of reprisals while he was hospitalized. Sullivan ultimately agreed to view the lineup, where he immediately identified Austin as the shooter.

Trial commenced on July 13, 1999. The People's case in chief consisted of Holmes, Barron, Sullivan and a Chicago police forensic investigator. The parties also stipulated to the testimony of a Chicago police firearms examiner, three treating physicians from Cook County Hospital and two treating physicians from the Rehabilitation Institute of Chicago. The People also presented photographs, shell casings, fired bullets and the single cartridge before resting.

At the close of the People's case in chief, the defendant unsuccessfully moved for a directed verdict. Defendant's case in chief then proceeded by stipulation. The parties stipulated to Holmes' prior sworn account of the incident. In her statement, Holmes contradicted herself, indicating that the shooter was the one with the silver gun. She indicated the person with the silver gun was Chapman, not Austin.

The parties next stipulated to Barron's conversation with Detective Marsalek relating to his whereabouts and knowledge during the shooting. At that time, Barron indicated he had no knowledge of anyone answering to the gang nickname attributed to Austin. The parties further stipulated to an oral conversation between Sullivan and Detective Breska. Sullivan later gave a written statement to the State's Attorney. In the oral statement Sullivan reported seeing Austin and two other men and that the shooter was one of the other men. In the written statement, Sullivan reported sighting Austin before he went into the restaurant and that he was shot only after he ran from the scene and returned to assist Monique Holmes.

In rebuttal, Detective Breska testified that the source of Austin's gang nickname was Monique Holmes' boyfriend, Joseph Williams, and not from the police before the lineups. Breska acknowledged the following other statements by the witnesses to the lineups: (1) Barron said he did not see the shooting; and (2) Sullivan said he could provide no information beyond saying that he saw a car go by. Breska summarized the out-of-court statements as not identifying a person familiar to the witnesses. In his recollection, one of the witnesses disclosed that the shooter "wasn't anybody he knew." Breska indicated he interviewed both Sullivan and Barron, then submitted general progress reports (GPR) regarding each interview. The Barron GPR was presented without problems. The Sullivan GPR was missing, so the trial court entered a continuance to allow Breska to look for it. When next in session, Breska explained to the court that he looked for the Sullivan GPR but could not find it. The State rested in rebuttal without further evidence.

After closing arguments, the trial court found Austin guilty on all counts. The trial court then denied a motion for new trial and entered sentence. The court then allowed Austin to argue an oral motion for a new sentence and gave him the right to supplement the argument in writing at a later date. The trial court rejected the lone argument that the maximum sentence imposed was excessive. No written motion for a new sentence was ever filed.

## ANALYSIS

### I

Austin argues on appeal that the evidence did not prove the identity of the offender. According to Austin, the opportunity to observe the offender was fleeting, a key accuser was impeached by former testimony of the failure to see the shooter, and no witness was positive, consistent and reliable. Austin also objects, whether or not he uses it himself, to the repeated use by the People of the inflammatory nickname "Psycho Mike." He claims the nickname was used insidiously to bolster the People's case by casting him in a worse light than was necessary.

Holmes, Barron and Sullivan all testified that they were injured near the Tasty Sub restaurant. These witnesses concurred that the gunman "or somebody" was standing or emerging from a vacant lot across Chicago Avenue. The vacant lot in question is not only across the street, but is at an angle three addresses away. Holmes said the gunmen were suspicious people in dark clothing and hoods who were behind a Chevy Blazer. Sullivan claimed he only saw the area for a second and Barron glanced in the direction, broke and ran. Austin

also argues that, although the streetlights were operating, there was no light from the churches, abandoned buildings or closed businesses near the offenders. Sullivan admitted he had been smoking marijuana prior to the incident. Holmes never made an identification to the police but identified Austin at trial and claimed she told the public defender his name. At Austin's sentencing hearing, in the unrelated case, which took place prior to this trial, Holmes testified she saw two people across from the Tasty Sub restaurant, but that she only saw one of those people shoot. Holmes described the person she saw shooting as a light-skinned person whom she identified as codefendant Chapman. She also specifically testified that she neither saw what Austin did nor got a good look at who actually shot her.

Sullivan, on the date of the incident, told the police that the shots came from a red Lexus with four occupants. He did not correct this story during the two police visits to the hospital. In January 1996, Sullivan gave two versions of the events. In one version, Sullivan claimed the shooter was one of the two other men who exited the vacant lot with Austin. The other version of the events suggested that, before he entered the restaurant, Sullivan saw Austin. In that version, Sullivan was shot only after he ran from the scene and returned to help Holmes.

Barron also failed to identify Austin to the police until the lineup six weeks after the shooting. While hospitalized, he told Detective Breska he did not see the incident or who was shooting. He told the police that the shooter "wasn't anybody he knew." He also told Detective Marsalek that he had no knowledge of anyone answering to Austin's nickname. Austin also objects to the way the police conducted the lineup in this case.

The People respond that the identification testimony was sufficient, as it was based upon the statements of three separate eyewitnesses, which the People argue is sufficient to convict Austin beyond a reasonable doubt. The People claim that any of the identifications in this case, standing alone, would be sufficient to convict Austin. All three of the witnesses had ample opportunity to observe Austin at the time of the offense. The People emphasize that, upon finding Austin guilty, the trial court expressly believed the explanations of Barron and Sullivan when they said they were initially reticent to help the police because they feared for their lives from the defendant. The trial court found their initial reticence to cooperate understandable and reasonable under the circumstances.

The People also claim that Holmes was busy learning to cope with life in a wheelchair, which was why, initially, she was not as helpful with the police as she otherwise could have been. The People argue

that, when she decided to be helpful, Holmes was consistent with her identification. The People argue the defense was being deliberately obfuscatory by emphasizing that Homes at one point had claimed the shooter was a "lighter-skinned person." Of the two men, Chapman is the lighter-skinned person. Chapman was with Austin in the lot across the street. While ordinarily a defendant is within his or her rights to point the finger at other people, the People argue it was not reasonable to do so since Holmes ultimately identified Austin and Chapman as both having been shooters. The People argue that the witnesses were completely certain of their identification of the defendant during the lineup. The People also argue that any delay between the shooting and the identification is not fatal to this lineup identification. The six-week delay does not make the identifications any less trustworthy.

■ ■ "In a bench trial it is for the trial judge to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom and to resolve any conflicts in the evidence." *People v. Mullen*, 313 Ill. App. 3d 718, 724 (2000), citing *People v. Slim*, 127 Ill. 2d 302, 307 (1989). " 'A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.' " *People v. Cox*, 195 Ill. 2d 378, 387 (2001), quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pearson*, 324 Ill. App. 3d 622, 625 (2001), citing *People v. Minniweather*, 301 Ill. App. 3d 574, 577 (1998); *People v. Hurtado-Rodriguez*, 326 Ill. App. 3d 76, 84 (2001), citing *People v. Perez*, 189 Ill. 2d 254, 265-66 (2000); *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). In viewing the sufficiency of the evidence, we will not retry the defendant. *Cox*, 195 Ill. 2d at 387, citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999). On review, the trial court's judgment will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt. *Slim*, 127 Ill. 2d at 307, citing *People v. Johnson*, 114 Ill. 2d 170, 190 (1986). We understand great deference should be given to trial judges when they hear the evidence and observe the witnesses. *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000), citing *People v. Furby*, 138 Ill. 2d 434, 455 (1990).

■ "As for witness identification of the accused, a single witness' identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Pearson*, 324 Ill. App. 3d at 625-26, citing *Slim*, 127 Ill. 2d at 307. "In

assessing the reliability of identification testimony, courts consider (1) the opportunity for the witness to view the perpetrator at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty of the witness at the subsequent identification; and (5) the length of time between the crime and the identification." *Pearson*, 324 Ill. App. 3d at 626, citing *Slim*, 127 Ill. 2d at 307-08. Discrepancies and omissions as to facial and other physical features are not fatal but affect the weight to be given the identification testimony. *Pearson*, 324 Ill. App. 3d at 626, citing *Slim*, 127 Ill. 2d at 308. A witness' positive identification is sufficient even though the witness gives only a general description based on the total impression the accused's appearance made. *Pearson*, 324 Ill. App. 3d at 626, citing *Slim*, 127 Ill. 2d at 309.

■ Although Austin would have us disqualify the identification testimony based on the fact that these witnesses did not come forward immediately, we cannot ignore the fact that the trial court was presented with testimony of no less than three witnesses placing Austin and Chapman at the scene, with guns in hand, shooting. These witnesses were, to one degree or another, sufficiently familiar with Austin to make both their identifications and fear of reprisals accurate and reasonable under the circumstances. These witness identifications are mutually corroborative when viewed in the context of the events *in toto*. Although some of the identifications were not made until well after the date of the shootings, that does not automatically render them incompetent. "The lapse of time goes only to the weight of the testimony, a question for the jury, and does not destroy the witness's credibility." *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972). The same would hold true for a bench trial where the trial court acts as the trier of fact. As to the issue of the witness identification of Austin, we find no basis for discounting the trial court's findings.

■ Austin also objects to the repeated use of his gang nickname. Austin argues the nickname was used excessively, creating a prejudicial effect in the mind of the trier of fact, in this case the judge. While we can see how calling someone "Psycho Mike," especially if that person was being tried before a jury, could rise to a level high enough to taint the proceedings, this is not such a case here, as this was a bench trial. It is well settled that, in bench trials, "the trial judge is presumed to disregard incompetent matters presented to him." *People v. Brown*, 243 Ill. App. 3d 1057, 1066 (1993). Further, "Appellate courts assume that a trial judge considered only competent evidence in sentencing a defendant and this assumption will be overcome only if the record affirmatively demonstrates the contrary." *People v. Primm*, 319 Ill. App. 3d 411, 425 (2000), citing *People v. Kolzow*, 301

Ill. App. 3d 1, 8 (1998). Additionally, it should not be the trial court's fault that Austin's *nom de voyage* is "Psycho." This is especially true when members of the community come to know him as "Psycho." A name like Psycho is certainly a sword that cuts both ways. In a bench trial, where the judge who rules on the facts is the same one who would rule on any motions *in limine*, this issue is effectively mooted. That being said, when one chooses a street name for intimidating effect, especially in the bench trial situation, one has to take the consequences.

## II

■ Austin next objects to the imposition of consecutive sentences. His argument is premised on the landmark case of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Austin argues the sentencing statutes were unconstitutionally applied to him because the consecutive sentences increased his penalty beyond the statutory maximum without the benefit of having been based on a jury determination beyond a reasonable doubt. He prays that this court convert his consecutive sentences into concurrent ones. This issue has been settled by the Illinois Supreme Court in *People v. Wagener*, 196 Ill. 2d 269 (2001). *Apprendi* does not apply to consecutive sentences. "Our jurisprudence, therefore, makes it clear that consecutive sentences do not constitute a single sentence and cannot be combined as though they were one sentence for one offense. Each conviction results in a discrete sentence that must be treated individually." *People v. Carney*, 196 Ill. 2d 518, 530 (2001).

## III

■ Austin next argues that the 210-year sentence exceeds the statutory maximum. At sentencing, the trial court sentenced Austin to 90 years for three attempted murder convictions but imposed the terms consecutively to another case. The sentence on the other case was 120 years. At hearing, counsel had objected that consecutive sentencing on more than two counts is unlawful because it amounts to the stacking of penalties which is in violation of established statutes and precedent.

The People concede that defendant's aggregate sentences for both cases should not have exceeded 160 years. We agree. This case will also need to be resentenced. The defendant's other case, *People v. Austin*, 1—99—1272 (December 11, 2001) (unpublished order under Supreme Court Rule 23), recently ruled upon by this court, has been remanded for a new sentencing hearing. As of this writing, the other case still pends below, awaiting resentencing. The appropriate sentence to be imposed in this matter will impact, and in turn be impacted

upon, by the final outcome of the other case. In light of the complexities of sentencing, we opt to leave the issue in the purview of the trial court, which will have the benefit of both orders of this court as guidance.

## IV

Austin next argues that the consecutive sentence on the conviction for the attempted murder of Verlee Barron was invalid where, as he characterizes it, no severe bodily injury resulted. He argues that, under the Unified Code of Corrections, a court may not impose consecutive terms for Class X offenses arising from a single course of conduct unless the defendant inflicts severe bodily injury. 730 ILCS 5/5—8—4(a) (West 1992) ("The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, *** in which event the court shall enter sentences to run consecutively"). Austin argues that Barron's two gunshot wounds do not rise to the level of severity necessary to implicate the consecutive sentencing provision.

The People respond that this argument is waived for failure to include it in either an oral or written motion. Assuming *arguendo* that this court decides to treat the issue under a plain error analysis, the People argue that Barron suffered severe bodily injury. The gunshot wound injuries required serious medical treatment. The People argue that a gunshot wound to the victim's back requiring overnight hospitalization amounts to severe bodily injury. As a serious bodily injury, the trial court's imposition of a consecutive sentence is warranted.

■ Generally, alleged errors must be objected to at trial and specified in a posttrial motion in order to preserve them for appeal. *People v. Armstead*, 322 Ill. App. 3d 1, 11 (2001), citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Although a lack of a timely objection waives such a challenge for review, the rule of waiver is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result. *Armstead*, 322 Ill. App. 3d at 11-12, citing *People v. Lopez*, 152 Ill. App. 3d 667, 672 (1987).

"An exception to the waiver rule exists under the plain error doctrine. Under the plain error doctrine, issues regarding the violation of constitutional rights not properly preserved for review may still be reviewed under two circumstances: (1) where the evidence is closely balanced, or (2) where the error is of such a magnitude that the com-

mission thereof denied the defendant a fair trial." *Armstead*, 322 Ill. App. 3d at 12, citing 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").

■ ■ Although we are not obligated, pursuant to the doctrine of waiver, to address issues that are not properly preserved for our review, we will address Austin's claim in an effort to be instructive when the trial court resentences him. In order to do so, we must first look at section 5—8—4 of the Illinois Unified Code of Corrections (730 ILCS 5/5—8—4 (West 1992)). The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Whitney*, 188 Ill. 2d 91, 97 (1999), citing *People v. Hickman*, 163 Ill. 2d 250, 261 (1994). The statutory language should be given its plain and ordinary meaning. *Whitney*, 188 Ill. 2d at 97, citing *People v. Robinson*, 172 Ill. 2d 452, 457 (1996). "[P]enal statutes are strictly construed in favor of the defendant as a general matter." *Whitney*, 188 Ill. 2d at 98, citing *Robinson*, 172 Ill. 2d at 461. "Any ambiguity in a penal statute should be construed and resolved in favor of the defendant." *Whitney*, 188 Ill. 2d at 98, citing *Robinson*, 172 Ill. 2d at 457. The Illinois Supreme Court has concluded that, under section 5—8—4(a), consecutive sentences require either a Class X or Class 1 felony wherein the defendant has inflicted severe bodily injury during the commission of the felony. *Whitney*, 188 Ill. 2d at 98-99. In so ruling, the Illinois Supreme Court points out that consecutive sentences are exceptions to the general rule prohibiting such sentences when offenses are committed as part of a single course of conduct. *Whitney*, 188 Ill. 2d at 99. There is no doubt that these unfortunate victims were injured during a single course of conduct, making severe bodily injury a prerequisite to any consecutive sentence. The facts clearly show that the defendants committed these crimes as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. *Whitney*, 188 Ill. 2d at 99. Accordingly, severe bodily injury must accompany the triggering offense and must be truly severe. *Whitney*, 188 Ill. 2d at 98; *People v. Curry*, 178 Ill. 2d 509 (1997).

■ Severity, being factual in nature, is best left to the trier of fact. In this case, the trial court was in the best position to evaluate all the relevant factors and determine whether or not the injuries were severe. This is because "[t]he trial court is best suited to determine the most appropriate sentence." *Primm*, 319 Ill. App. 3d at 425. This court would accept as an axiom that not all gunshot wounds are severe just because they are gunshot wounds, but, rather, it depends on the unique facts and circumstances of each case. In the case at bar, however, the fact that Barron was shot in the back and grazed on the

side of the head near his left ear, such that his injuries required an overnight hospitalization, certainly militates in favor of severity. It is well established that "[a] trial court's sentencing decision is entitled to great deference and will not be disturbed absent a showing of abuse of discretion." *Primm*, 319 Ill. App. 3d at 425, citing *Kozlow*, 301 Ill. App. 3d at 8. As to the finding that Barron's wounds were severe, we find no basis for upsetting the discretionary finding of the trial court.

## V

█ Finally, Austin argues that the armed violence convictions must be reversed as they violate the doctrine of one act, one crime and, alternatively, because the trial court sentenced defendant on the armed violence counts pursuant to a sentencing scheme which violates the "single subject rule" of the Illinois Constitution. Ill. Const. 1970, art. IV, § 8(d). Although the People conceded proper merger of the armed violence convictions, the court denied merger on the basis of the statutory amendment to the Criminal Code of 1961 that increased the 6-year minimum sentence to 15 years. 720 ILCS 5/33A—3(a), 12—4(a) (West 1998). The trial court's reference was to Public Act 88—680 (Pub. Act 88—680, eff. January 1, 1995), which was held unconstitutional for violating the single subject rule. *People v. Cervantes*, 189 Ill. 2d 80 (1999). Austin argues that each armed violence conviction was based on the same physical act resulting in the convictions for attempted murder of each respective victim.

The People concede that the armed violence counts should properly have been merged with their respective attempted murder convictions. We agree. A defendant cannot be convicted and sentenced for more than one offense arising out of the same physical act. *People v. Burrage*, 269 Ill. App. 3d 67, 72 (1994). "Multiple convictions for closely related conduct are prohibited when the convictions are 'carved from the same physical act' or when one conviction is for an included offense of the other." *People v. Lindsey*, 324 Ill. App. 3d 193, 200 (2001), quoting *People v. King*, 66 Ill. 2d 551, 566 (1977). When more than one offense arises from the same physical act, a judgment of conviction and sentence should be imposed on the more serious offense. *Burrage*, 269 Ill. App. 3d at 73, citing *People v. Donaldson*, 91 Ill. 2d 164, 170 (1982). In the instant case, though the amounts of the sentences need to be reconsidered, the underlying convictions for attempted murder are more serious than armed violence. *Burrage*, 269 Ill. App. 3d at 73. Since the trial court, upon remand, will be obligated to impose a lawful sentence on the most serious crimes, the armed violence convictions must be vacated.

## CONCLUSION

In light of the foregoing, the judgment of the trial court is af-

firmed in part, vacated in part, and reversed in part, and the cause remanded for sentencing with directions.

Affirmed in part, vacated in part, reversed in part and remanded with directions.

GREIMAN, J., concurs.

JUSTICE QUINN, specially concurring.

I concur in the affirmance of the defendant's convictions for attempted first degree murder and aggravated battery with a firearm. I also concur in the reversal of defendant's convictions for armed violence based on merger. I write separately to express my belief that this case should not be remanded for resentencing. As the majority makes clear, defendant's three consecutive 30-year terms of imprisonment were proper under section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1994)). However, defendant's aggregate sentence of 210 years did violate the limiting language of subsection 5—8—4(c)(2), which stated:

"[T]he aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under Section 5—8—2 for the 2 most serious felonies involved." 730 ILCS 5/5—8—4(c)(2) (West 1994).

Under subsection 5—8—2(c)(2), the maximum sentence for defendant's first degree murder conviction in the unrelated case was 100 years and the maximum sentence for any one of his attempted murder convictions in this case was 60 years. Consequently, defendant's aggregate maximum sentence under subsection 5—8—4(c)(2), as written at the time of this offense, was 160 years. *People v. Pullen*, 192 Ill. 2d 36, 45 (2000); *People v. Tucker*, 167 Ill. 2d 431, 436 (1995). It should be noted that subsection 5—8—4(c)(2) was amended effective July 22, 1997, to provide that its limitations do not apply to offenses which were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. The factual scenario in the case *sub judice* would make this amended language applicable to this defendant but the amendment is only applicable to offenses committed after July 22, 1997.

In the unrelated case, defendant was sentenced to an extended term of 90 years for first degree murder and 30 years consecutively for attempted first degree murder. This court vacated the sentences as the 90-year extended term violated the holding in *Apprendi*. *People v. Austin*, 1—99—1272 (December 11, 2001) (unpublished order under

Supreme Court Rule 23, McBride, J., dissenting). As the sentences in that case have been vacated, the 90-year sentence imposed in this case fully complies with section 5—8—4(c)(2) of the Unified Code of Corrections. 730 ILCS 5/5—8—4(c)(2) (West 1994).

I understand the rationale behind remanding this case for resentencing. As a practical matter, however, defendant must now be resentenced for both cases. One of the trial courts must impose a sentence before the other court imposes the second sentence. As defendant's sentence in this case no longer violates subsection 5—8—4(c)(2), and there are no other grounds upon which this court should vacate that sentence, I would not remand this case for resentencing.